Martin Milton MILLER, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 08–95–00111–CR.

Court of Appeals of Texas, El Paso.

Dec. 19, 1996.

Robert V. Garcia, Jr., Odessa, for Appellant.

Albert G. Valadez, District Attorney, Fort Stockton, for Appellee.

Before BARAJAS, C.J., and McCLURE and CHEW, JJ.

## OPINION

McCLURE, Justice.

Martin Milton Miller, Jr. ("Miller") was found guilty of the murder of his brother, Bruce Edward Miller ("Bruce"). He was sentenced to life imprisonment and fined $10,000. In his first point of error, Miller asserts that the State should not have tendered evidence of his post-arrest silence to impeach his self-defense theory. Because no objection was made at trial, he asserts that admission of this evidence constituted fundamental error. In his next three points of error, Miller asserts that his counsel was ineffective because he failed to object to evidence of post-arrest silence, post-arrest interrogation, and other bad acts. We affirm.

## SUMMARY OF THE EVIDENCE

Because of the defensive theories argued at trial and the dysfunctional family relationships which culminated in this case of fratricide, a detailed analysis of the evidence is required. At 4:20 on the afternoon of December 27, 1991, Miller walked into the Brewster County Sheriff's department. Four deputies were sitting in the reception area as Miller entered. He turned to one of the deputies, handed him the keys to his pickup, and said, "You had better lock me up." When the deputy asked him why, Miller replied, "I just killed my brother." He then told the deputies that his brother had turned off the television and asked him to leave. While the deputies conducted a pat-down search, Miller said, "All I have is this book and when I get through reading it, well, then you can go ahead and shoot me." After receiving his *Miranda* warning, Miller requested that counsel be appointed for him because he did not have the means to otherwise hire an attorney. Deputy Alfred Alee testified that Miller continued to talk on his own after requesting that counsel be appointed. Deputy Alee inquired whether an ambulance might be needed in the event Miller's brother was still alive. To this, Miller replied, "Oh, he is dead all right." With respect to his brother cutting off the television and telling him to get out of the house, Miller said, "I don't know why I got so mad. He made me so Goddamn mad I just walked in there and started shooting."

When Sheriff Jack McDaniel learned that Miller had confessed to killing his brother, the Sheriff asked Miller where the gun was located. Miller replied that it was in his pickup. Sheriff McDaniel then got the keys from one of the deputies and went outside to check the truck. In it, he found a half-empty box of chicken, a survival belt with a knife and a flashlight, a loaded .45 semiautomatic Gold Cup Colt, a loaded Smith & Wesson .38 Special, and two loaded rifles.

Four deputies were dispatched to Bruce's ranch to investigate and they found Bruce's body in the living room between a fireplace and a couch. While the precise layout of the crime scene is not clear from the evidence, it appears that the living room was attached to the kitchen, and this area was mostly open. A hallway led into this area, but its precise entrance point is uncertain. A staircase was located at the other end of the hallway. Several deputies testified that shell casings from a .45 automatic were laying in various parts of the living room, the kitchen, and down a hallway. On the day of the murder, the deputies found four casings. One was found in front of the television in the living room; another was found by the dishwasher in the kitchen; still a third was found behind the couch. The fourth casing was found in the hallway at the base of the stairway. The following day, the deputies continued their investigation and found three more casings and a bullet. One of the casings was found under a chair in a telephone nook located in the hallway. Another was found under the couch, and the third was found on an end table at the end of the couch. The bullet was found on top of the springs in the couch. No weapons were found on or near Bruce.

After visiting the crime scene, Sheriff McDaniel went to see Miller at the jail in order to obtain information as to the identify and location of relatives for notification purposes. Miller was uncooperative and replied that his relatives did not tell him anything anymore. He alluded that this was the reason for the fight with his brother. When Miller began talking about the fight, Sheriff McDaniel said, "fine," discontinued questioning him, and left.

The autopsy revealed that Bruce had been shot nine times, three times to the head and neck, five times to the upper body, and once in the back. One bullet entered the chest area and lodged in the heart. Another pierced the right arm, exited that arm, and then reentered the upper body, passing through the right lung and lodging near the spinal column. A third bullet hit Bruce in the back and perforated his colon; another hit his left arm. The remaining three bullets hit Bruce in the head and neck, traveling in a left to right direction. One of these bullets lodged in Bruce's brain. The bullets removed from Bruce's body matched the Colt .45 automatic found in Miller's pickup, a gun holding eight rounds. The coroner testified that four of these gunshot wounds would

have been fatal and concluded that Bruce had died of multiple gunshot wounds. He also testified that several of the entry wounds could indicate that Bruce had been shot while laying on the ground. A forensic chemist testified that one of the fatal wounds, the one that had pierced Bruce's heart, was likely the first shot fired. The coroner testified that a person suffering this kind of wound would probably remain conscious for about fifteen seconds and would die within minutes from massive hemorrhaging.

Miller took the stand during trial in an attempt to explain the day's events. At the time, Miller was living with his brother and his brother's family in a room over the garage. He testified that he woke up that morning and began watching television in his room. That morning, Phyllis Miller ("Phyllis"), Bruce's wife, telephoned Bruce and told him that she was not returning home until Miller was gone.[1] At hearing this, Bruce cut the cable television connection to Miller's room. When Miller came down to investigate, he found his brother at the kitchen counter fixing a sandwich. When Miller asked what was going on with the television, Bruce told him that he had cut the cable and that he wanted Miller to move out. Miller testified that Bruce told him that if he did not get out, Bruce would kill him. Miller returned to his room and sat for two or three minutes, growing increasingly angry. He then decided that he would not leave because he had as much right as his brother to live in the ranch house, which belonged to their mother. Miller testified that because his brother was a ferociously violent person, he armed himself before going down to confront him. He then went downstairs and told his brother that he was not leaving, that he had a right to be there, and that Phyllis and the children were better off in Houston. As he turned to leave, he heard Bruce's chair squeak. When he looked around, he saw his brother charging at him with his fists clenched. Bruce had nothing but "pure rage" in his eyes and Miller had no doubt as to his brother's intentions. He testified that as he told his brother to back off, he raised

the gun and fired two shots, most likely hitting Bruce in the chest. He did not mean to fire, but the gun had a hair trigger and discharged before he knew what was happening. Miller then testified that his brother turned his hands up in a choke position and charged at him, growling like an animal. Seeing this, Miller unloaded the gun in his brother's direction. Bruce spun to the right and then fell to the ground. Miller admitted that he might have shot Bruce in the back as he spun around.

Recognizing what he had done, Miller contemplated suicide. He decided instead that he should find his mother and ask if she were satisfied with what she had wrought. He drove around Alpine looking for her, but he did not know where she lived because for a two-year period, he had been under a protective order to keep away from her. He stopped for gasoline and picked up a box of chicken because he was hungry. He then drove from Alpine to Fort Davis and on to Marfa in search of his mother. As he was leaving Fort Davis, his sister, Cynthia Ming ("Ming"), passed him in her Mercedes. Miller claimed that because his truck was old and run down, he could not keep up with her. Ming, on the other hand, testified that Miller chased her at speeds reaching 95 miles per hour. After driving through Marfa, Miller gave up trying to locate his mother and decided to turn himself into the authorities. He returned to the ranch, loaded his guns into the pickup, and drove to the Sheriff's department.

Miller testified at length about the dysfunctional nature of his family and about the twisted course of his life that left him paralyzed between the fantasy world of television and the real world that owed him everything and paid him nothing. Admittedly, Miller had not accomplished much in his some forty years of life, and prior to the murder, he did nothing but live off the charity of others, contributing little of his own industry for the benefit of those upon whose hospitality he was dependent. He spent much of his day watching television, drinking beer, and smok-

---

1. On December 20, 1991, approximately one week before the murder, Phyllis had taken her two sons and left for Houston.

ing cigarettes. Miller quit school in the ninth grade. He went to Lee College in Baytown to learn welding, but he never made it a career. He was in the backhoe business for about a year and a half. Miller testified that his mother had paid for him to go to a trucking school in San Angelo, but he was still in the process of obtaining the necessary licensing in Texas. Other than these brief forays into the world of employment, Miller did odd jobs around the house and the ranch. He also spent many of his earlier years caring for his maternal grandparents.

Miller testified at length concerning what a cruel woman his mother was, and that he blamed her for everything unfortunate that had befallen him in his life, including Bruce's death. He portrayed her as a mean-spirited, controlling tyrant who cared nothing for her sons. When they were very young, Miller and Bruce were sent away to live with their grandparents and had little contact with their parents after that. Nevertheless, his mother maintained control over both sons by promising them, but withholding from them, title to the ranch outside Alpine. She showered her entire affection on her daughter, Ming. As an example, Miller related that his mother had given Ming $53,000 to travel through Europe. Ming lived with her mother, while Miller and Bruce were shunned. Specifically, he claimed that his mother had evicted him from one of the houses at the ranch and would have nothing to do with him.

Miller also testified that when he was ten years old, he discovered that his mother had been withholding dividend checks on stock given him and Bruce by their maternal grandfather. She had not deposited these checks or otherwise attempted to preserve them for the brothers' future benefit, despite the fact that she had been depositing Ming's checks. Ultimately, the brothers received the stock, which they sold in order to cover their living expenses. After Miller's father died in 1985, his mother had all three children sign papers which were related to the probate of their father's estate. Miller came to believe that these papers effectively disinherited him of his interest in an estate he valued at $60 million. During the punish-

ment phase of Miller's trial, Miller's mother testified that all the money originated with her family and that Miller was not entitled to any of it until her death.

During cross-examination, the State elicited testimony that Miller had not been severely mistreated by his mother. She provided him with housing and a living allowance several times during his life. In return, he worked on her properties and cared for his grandparents. Miller's mother also gave him at least three cars, two of them new Corvettes, and a four bedroom house in Baytown. She also paid for him to go to truck driving school and for his living expenses during this time. Miller moved from Austin, where he cared for his grandparents, to a rock house on the Alpine ranch. His wife did not join him, moving instead to California to live with her sister. Shortly after Miller moved into the rock house, his mother evicted him, although the exact reason is unclear from the record. He joined his wife in California. There, he spent his days watching television, drinking beer, and smoking cigarettes. He contributed little to this living arrangement and eventually his wife's relatives asked him to leave. From there, Miller's wife returned to Austin, and Miller moved in with Bruce.

Miller also painted an evil picture of his brother, portraying him as a violent person who had severely beaten several boys in high school and who routinely assaulted his wife. He related a story in which he saw Phyllis cleaning blood from her mouth over the bathroom sink. He also tendered voluminous records from the Rio Pecos Family Crisis Center which reflected a long history of domestic violence. Miller also testified that Bruce had beat him on several occasions and that he was afraid of his brother. He claimed that Bruce had once shot him with a BB gun and that Bruce had shoved him against the wall or through a screen door at a birthday party. Several other witnesses testified to this occurrence. Finally, Miller testified that his brother severely beat him and attempted to strangle him when he mentioned that he and Bruce should sue their mother. Bruce hit him so hard that he uri-

nated blood for several days and lay in bed for a week.

Phyllis confirmed much of Miller's story that her mother-in-law was the root cause of this family's troubles. However, she contradicted much of Miller's assertions that Bruce was a killer at heart. She testified that shortly after moving in, Miller began breaking many of the ground rules laid down by Bruce. Because Bruce suffered from severe allergies, he could not abide cigarette smoke. Miller soon disregarded the rule that he could not smoke in the house. Phyllis testified that Miller ceased acting like a guest and began behaving as if he had a right to live in the house. Furthermore, he continually asked her and Bruce for money to buy beer and cigarettes. Late one night, Miller came into their room and demanded that Bruce join him in filing a lawsuit against their mother. That same evening, Miller threatened to break her arm if she changed the channels on the television again.[2] Phyllis testified that she had left Bruce because she was afraid of Miller, thus contradicting Miller's claim that she left because Bruce was abusive.

## IMPEACHMENT

In his first point of error, Miller complains that evidence of his post-arrest silence was used by the State to impeach his theory of self-defense. Because no objection to this evidence was lodged, Miller, relying on TEX. R.CRIM.EVID. 103(d), asserts that its admission constitutes fundamental error. We disagree.

■ When a criminal defendant takes the witness stand, that defendant may be cross-examined and impeached as any other witness. *See Cisneros v. State*, 692 S.W.2d 78, 83 (Tex.Crim.App.1985); *Franklin v. State*, 606 S.W.2d 818, 851 (Tex.Crim.App.1979)(Onion, J., concurring opinion on Appellant's Motion for Rehearing). The defendant may be "impeached, contradicted, made to give evidence against himself, cross-examined as to new matters, and treated in every respect as any other

witness testifying in his behalf." *See Cuellar v. State*, 613 S.W.2d 494, 495 (Tex.Crim.App. 1981). However, this general rule is qualified by any overriding constitutional or statutory prohibitions. *Id.*; *see also Cisneros*, 692 S.W.2d at 83. It is well established that the State may not use post-arrest, post-*Miranda* silence to impeach or discredit an exculpatory theory, including a self-defense claim, elicited for the first time at trial. *See Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); *Cisneros*, 692 S.W.2d at 84; *Cuellar*, 613 S.W.2d at 495. The Court of Criminal Appeals has expanded this prohibition pursuant to the Texas Constitution to include post-arrest, pre*Miranda* silence. *Sanchez v. State*, 707 S.W.2d 575 (Tex.Crim.App.1986).

■ To preserve error concerning the erroneous admission of evidence, a defendant must timely lodge a specific objection. TEX. R.APP.P. 52(a); TEX.R.CRIM.EVID. 103(a)(1); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim.App.1990); *Cisneros*, 692 S.W.2d at 82–83; *Cacy v. State*, 901 S.W.2d 691, 699 (Tex. App.—El Paso 1995, pet. ref'd). This allows the trial court to rule on the objectionable matter and to allow opposing counsel an opportunity to supply other testimony or to withdraw the evidence. *See Zillender v. State*, 557 S.W.2d 515, 517 (Tex.Crim.App. 1977). Other than the right to trial by jury, a criminal defendant may waive any error, including constitutional error, by failing to properly object or request the proper relief. *See Little v. State*, 758 S.W.2d 551, 563–64 (Tex.Crim.App.1988); *Perry v. State*, 703 S.W.2d 668, 673 (Tex.Crim.App.1986)(reversing lower court's holding that unconstitutionally suggestive identification procedure was fundamental error as unpreserved and stating that "no procedural principle is more familiar to appellate courts of this Nation than that a constitutional right may be waived or forfeited by the failure to make timely assertion of the right"); *Cacy*, 901 S.W.2d at 698. The defendant's right to remain silent and not have that silence used against him at trial is a forfeitable right. Consequently, a defendant must object in

---

**2.** Evidently, all the televisions in the house were connected to a central control box from which the channels could be controlled.

order to preserve complaints concerning the admission of evidence showing his pre-arrest and post-arrest silence. *Wheatfall v. State,* 882 S.W.2d 829, 836 (Tex.Crim.App.1994)(complaint concerning admission of evidence of defendant's post-arrest silence waived in absence of objection); *Smith v. State,* 721 S.W.2d 844, 855 (Tex.Crim.App.1986)(defendant's failure to object to admission of evidence showing post-arrest, pre-*Miranda* silence waived in absence of objection; admission of this evidence is not fundamental error); *Cisneros,* 692 S.W.2d at 83 (defendant's complaints concerning use of pre-arrest and post-arrest silence waived in absence of objection). No objection was made at any time during the State's presentation of this evidence. Thus, error has been waived unless Miller can establish that he was not required to object at trial.

▮▮▮ Miller, citing Rule 103(d) and our decision in *Cacy,* argues that admission of his post-arrest silence for impeachment purposes is fundamental error because it rendered his trial fundamentally unfair. In *Cacy,* we held that admission of evidence showing the defendant's invocation of her right to counsel is not fundamental error. *Cacy,* 901 S.W.2d at 699. Thus, *Cacy* does not support Miller's argument on appeal. Although Rule 103(d) purportedly contains an exception to the general rule that a party must object to the admission of evidence, the application of this exception has been extraordinarily frugal. One commentator has stated that "fundamental error in the admission or exclusion of evidence when opposing counsel has failed to object or make an offer of proof is so rare in current Texas criminal jurisprudence that it is almost nonexistent." James P. Wallace, *Article I: General Provisions,* 30 HOUS. L.REV. 168 (1993); *see also* 1 STEVEN GOODE ET AL., TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL 24 (2d ed.1993). It must be remembered that Rule 103(d) does not *create* an exception to the requirements of Rule 103(a) or Rule 52(a), but was intended to be purely declarative of prior law. 1 STEVEN GOODE ET AL. at 24; Official Comment to TEX.R.CRIM.EVID. 103 ("Adoption of this rule is not meant to change the Texas harmless error doctrine.

In subsection (d), the federal rule refers to plain error. This has been changed to fundamental error which conforms to Texas practice. The Committee intends no change through 103(d) in present Texas law."). Therefore, for our purposes, Rule 103(d) must be interpreted in light of existing law when considering whether Miller is excused from objecting to the admission of this evidence.

Shortly after the adoption of the Rules of Criminal Evidence, the Court of Criminal Appeals specifically held that impeachment through the use of post-arrest, pre-*Miranda* silence is not fundamental error. *Smith,* 721 S.W.2d at 855. Smith did not argue and the Court of Criminal Appeals did not discuss whether admission of this evidence rendered the defendant's trial fundamentally unfair. Nevertheless, in our review of case law existing at or near the time of the adoption of Rule 103(d), we have been unable to find any decisions holding that the admission of evidence rendered a defendant's trial fundamentally unfair, and therefore, constituted fundamental error so that the defendant's failure to object was excused. In fact, the Court of Criminal Appeals has reversed decisions of intermediate appellate courts which reached that conclusion. *See Briggs v. State,* 789 S.W.2d 918, 924 (Tex.Crim.App.1990)(reversing court of appeals' holding that pursuant to Rule 103(d), the defendant's failure to object did not waive his complaints that admission of videotape pursuant to TEX.CODE CRIM. PROC.ANN. art. 38.071 violated his rights to confrontation, due process, and due course of law; Court disagreed with court of appeals' conclusion that admission of the allegedly improper evidence rendered the proceedings "fundamentally unfair"); *Perry v. State,* 703 S.W.2d 668, 673 (Tex.Crim.App.1986)(reversing court of appeals' holding that defendant was not required to object to admission of unconstitutionally suggestive pretrial photo lineup since error was "so clear and so prejudicial"; court held that defendant's failure to object waived his constitutional right to identification by due process). Thus, we conclude that Rule 103(d) does not excuse Mil-

ler's failure to object to this evidence at trial.[3]

Our conclusion regarding Rule 103(d) is consistent with the recent decision in *Marin v. State* 851 S.W.2d 275 (Tex.Crim.App.1993). The Court, specifically citing Rule 103(d), held that some rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system. *Marin*, 851 S.W.2d at 278. A principle characteristic of these rights is that they cannot be forfeited or extinguished by inaction alone. *Id.* As a guideline for determining whether a defendant has waived a particular right, the Court described three distinct categories of rules found in our system: (1) absolute requirements and prohibitions; (2) rights of litigants which must be implemented by the system unless expressly waived; and (3) rights of litigants which are to be implemented upon request. *Id.* at 279. The requirement of Rule 52(a) that a defendant object in order to preserve error does not apply to rights falling within either of the first two categories. *Marin*, 851 S.W.2d at 279–80. By definition then, violations of rights falling within these two categories may be considered fundamental error.[4] On the other hand, *Marin* included evidentiary and procedural rules in the group of forfeitable rights. *Marin*, 851 S.W.2d at 278. In order to complain of the admission or exclusion of evidence at trial, a defendant must comply with the requirements of Tex.R.App.P. 52(a) and Tex.R.Crim. Evid. 103(a)(1). *Marin*, 851 S.W.2d at 279–80.

As stated earlier, a defendant's right to remain silent and not have that silence used against him at trial has long been considered a forfeitable trial right. *See Wheatfall*, 882 S.W.2d at 836; *Smith*, 721 S.W.2d at 855; *Cisneros*, 692 S.W.2d at 83. Thus, under *Marin* and Rule 52(a), failure to object at trial results in procedural default. Miller's attempt to remove his complaint regarding the admission of this evidence out of the third category by arguing that it rendered his trial fundamentally unfair is contrary to the teaching of *Marin* in that it focuses upon the harm caused by the admission of the evidence rather than the category occupied by the particular right at issue. *See Marin*, 851 S.W.2d at 279. Because Miller's complaint concerns the admission of evidence, we hold that he was required to object at trial in order to preserve error. Having failed to do so, the contention is waived. Tex.R.Crim. Evid. 103(a)(1); Tex.R.App.P. 52(a). Point of Error No. One is overruled.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In Points of Error Nos. Two through Four, Miller asserts that he was denied effective assistance of counsel. First, he alleges that his attorney was ineffective because he failed to object to the numerous times that the State presented evidence of his post-arrest silence. Second, Miller complains that he was interrogated outside the presence of counsel on at least two different occasions and because incriminating statements that he made as a result were admitted into evidence with no objection.[5] Third, Miller asserts that his attorney was ineffective because testimony was admitted concerning statements Miller made regarding his desire to kill his mother and the methods he proposed using to bring about her death. Miller urges that

---

**3.** To the extent any of our prior opinions may be read as suggesting that Rule 103(d) excuses a defendant from objecting to the admission of evidence at trial, they are expressly disavowed.

**4.** The Court of Criminal Appeals recently reaffirmed its intention to adhere to *Marin* by overturning the longstanding rule that a defendant need not object to incurable jury argument in order to preserve error. *Cockrell v. State*, 933 S.W.2d 73, 89–90 (Tex.Crim.App.1996)[overruling *Romo v. State*, 631 S.W.2d 504 (Tex.Crim. App.1982) and *Montoya v. State*, 744 S.W.2d 15, 37 (Tex.Crim.App.1987)]. Following *Marin*, the Court held that a defendant's right not to be

subjected to incurable erroneous jury arguments is one of those rights that is forfeited by a failure to insist upon it. *Cockrell*, 933 S.W.2d at 89–90. Consequently, a defendant must now object at trial and obtain an adverse ruling in order to complain on appeal of erroneous incurable jury argument.

**5.** The first occasion happened when Deputy Alee asked whether an ambulance was needed. To this inquiry, Miller replied that his brother was dead. The second incident occurred when Sheriff McDaniel asked where the murder weapon was located.

these lapses in the representation afforded him, denied him his right to counsel, during both the guilt-innocence phase and the punishment phase of his trial.

▮ A defendant is entitled to "reasonably effective assistance." *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674, 693 (1984); *Stafford v. State,* 813 S.W.2d 503, 506 (Tex.Crim. App.1991). However, a defendant is not entitled to errorless counsel or counsel whose competency is judged by hindsight. *Stafford,* 813 S.W.2d at 506.

With respect to the guilt-innocence phase of the trial, the proper standard for determining claims of ineffective assistance under the Sixth Amendment is the two step analysis adopted by the United States Supreme Court in *Strickland. Vasquez v. State,* 830 S.W.2d 948, 949 (Tex.Crim.App.1992). Under the first prong, the defendant must show that counsel's performance was deficient to the extent that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. *Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994). The defendant must demonstrate that his attorney's representation fell below an objective standard of reasonableness under prevailing professional norms. *Vasquez,* 830 S.W.2d at 949. Under the second prong, the defendant must establish that counsel's deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; *Jackson,* 877 S.W.2d at 771. Prejudice is established by a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; *Jackson,* 877 S.W.2d at 771; *Hernandez v. State,* 726 S.W.2d 53, 55 (Tex.Crim.App.1986). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; *Jackson,* 877 S.W.2d at 771.

▮ When a claim of ineffective assistance of trial counsel is reviewed by this Court, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and the appellant must overcome the presumption that the challenged conduct can be considered sound trial strategy. *Jackson,* 877 S.W.2d at 771; *Lyon v. State,* 885 S.W.2d 506, 519 (Tex.App.—El Paso 1994, pet. ref'd). Consequently, allegations of ineffectiveness of counsel must be firmly founded in the record. *Hawkins v. State,* 660 S.W.2d 65, 75 (Tex.Crim.App.1983); *Lyon,* 885 S.W.2d at 519. Under the *Strickland* test, the appellant bears the burden of proving ineffective assistance by a preponderance of the evidence. *Jackson,* 877 S.W.2d at 771; *Lyon,* 885 S.W.2d at 519.

▮ When the alleged error of counsel deals with the punishment phase, we apply the standard set forth in *Ex parte Duffy,* 607 S.W.2d 507 (Tex.Crim.App.1980). *Ex parte Walker,* 794 S.W.2d 36, 37 (Tex.Crim. App.1990); *Ex parte Cruz,* 739 S.W.2d 53, 58 (Tex.Crim.App.1987). Under the *Duffy* test, we must determine whether counsel was reasonably likely to render effective assistance and whether counsel reasonably rendered effective assistance. *See Ex parte Langley,* 833 S.W.2d 141, 143 (Tex.Crim.App.1992); *Craig v. State,* 825 S.W.2d 128, 130 (Tex. Crim.App.1992). This analysis requires an examination of the "full scope of 'assistance'—representation, performance, delivery—for effectiveness rather than adequacy of ability or capacity to advise." *Ex parte Duffy,* 607 S.W.2d at 516 n. 17. In other words, the totality of the representation is considered. *See Ex parte Walker,* 777 S.W.2d 427, 431 (Tex.Crim.App.1989)(holding that a court's inquiry must necessarily include "the pre-trial representation of the [defendant], the guilt-innocence stage of the trial and the punishment stage of the trial"). However, as under *Strickland,* a defendant's constitutional right to counsel does not mean errorless counsel or counsel whose competency is judged by hindsight. *Ex parte Cruz,* 739 S.W.2d at 58. Furthermore, any allegations of ineffectiveness must be firmly founded in the record. *See Faz v. State,* 510 S.W.2d 922, 926 (Tex.Crim.App.1974); *Long v. State,* 502 S.W.2d 139, 141 (Tex.Crim.App. 1973). Trial counsel strategy must be taken into account in gauging the effectiveness of representation. *See Long,* 502 S.W.2d at

141. Though *Duffy* looks solely to the reasonableness of representation and does not apply *Strickland*'s second prong, a harm analysis is required. *See Stone v. State*, 751 S.W.2d 579, 582 (Tex.App.—Houston [1st Dist.] 1988, pet. ref'd); *cf. Ex parte Canedo*, 818 S.W.2d 814, 815 n. 3 (Tex.Crim.App.1991)(discussing harm); *Ex parte Felton*, 815 S.W.2d 733, 736 (Tex.Crim.App.1991)(employing a harm analysis to determine that counsel had been ineffective). Finally, the burden is on the appellant to demonstrate ineffective assistance of counsel by a preponderance of the evidence. *Moore v. State*, 694 S.W.2d 528, 531 (Tex. Crim.App.1985); *Jaile v. State*, 836 S.W.2d 680, 683, 686–87 (Tex.App.—El Paso 1992, no pet.).

■ In Point of Error No. Two, Miller asserts that his attorney was ineffective because of his failure to object to evidence of Miller's post-arrest silence and because he questioned Miller concerning this silence. As discussed above, the State may not use evidence of post-arrest silence for impeachment purposes. By failing to object, Miller waived error and the underlying constitutional right upon which it is based. This waiver is accentuated by the fact that Miller's attorney questioned him concerning his post-arrest silence. Because the State presented ample evidence refuting Miller's claim of self-defense, Miller fails to demonstrate how the State's use of his post-arrest silence prejudiced his defense. In light of the entire record, we find no reasonable probability that the result in the proceeding would have been different. In other words, Miller has failed to establish *Strickland*'s second prong. Point of Error No. Two is overruled.

Points of Error Nos. Three and Four are related in that they complain about the admission of allegedly objectionable evidence. Assuming without deciding that the admission of this evidence was erroneous, we conclude that the actions of Miller's attorney with respect to these items do not fall within the parameters of either of *Strickland*'s prongs.

■ First, Miller complains of two incidences in which he was interrogated by the Sheriff and one of the deputies after he had invoked his right to counsel. When Deputy Alee asked whether an ambulance was needed, anticipating that Miller's brother may have still been alive, Miller responded that his brother was surely dead. Next, when Sheriff McDaniel learned of the incident, he asked Miller where the weapon was. Miller told the sheriff that it was in his pickup. From this, the murder weapon was recovered. Because Miller asserted a self-defense theory during the trial, the facts that his brother was dead, that Miller had killed him, and that Miller had used a Colt .45 automatic were not even in issue. As a result, Miller's counsel may have felt it unnecessary, or perhaps improvident, to object to evidence relevant only to these ancillary issues. In addition, Miller has failed to show how this evidence prejudiced his defensive theories which were arguably unaffected by this evidence.

■ Second, Miller complains that his counsel permitted the introduction of evidence showing only that he possessed a bad character. Namely, he points to the fact that Phyllis testified that he obsessed over killing his mother. He daily talked about tying her to an ant bed and letting the ants devour her, burning her alive, and shooting her to death. One of the primary themes of Miller's defense concerned his mother's shameful treatment of him and his resulting hatred for her. Given that theory, we cannot find that the failure to object to this evidence was not purely strategic. Additionally, Miller has not shown how this evidence prejudiced his defense. For that matter and in light of his defensive strategy, it may well have been integral to his defense.

■ Finally, Miller does not demonstrate how this evidence introduced during the guilt-innocence phase affected the penalty phase of his trial. The primary issue in that phase, from Miller's perspective, was whether he should receive probation. The jury at this point had rejected the self-defense theory and the alternative position that Miller's maximum culpability was voluntary manslaughter. Miller testified that he could adhere to the terms of probation, elicited the testimony of one character witness, and dem-

onstrated that he did not have a history of violence. The jury rejected these arguments as well and assessed the maximum penalty allowed by law. Considering the entirety of the representation provided Miller in this case, nothing suggests that the alleged errors in the guilt-innocence phase of the trial so affected the representation that it fell below that threshold of reasonably effective counsel. We find no reason to believe that Miller's counsel was ineffective during this phase of his trial. Points of Error Nos. Three and Four are overruled. The judgment of the trial court is affirmed.

CHEW, Justice, concurring.

I fully concur in the disposition of this appeal but feel it necessary to write separately. First, I do not believe that this case involves the right to remain silent. Miller made numerous voluntary and unsolicited statements before his arrest, after his arrest, and after receiving *Miranda* warnings. He did not remain silent. *"Doyle* does not apply to cross-examination that merely inquiries into prior inconsistent statements." *Montoya v. State*, 744 S.W.2d 15, 27 (Tex.Crim.App. 1987). If that is the case, then the opinion unnecessarily deals with fundamental error and procedural default.

Finally, though the opinion well states the jurisprudence of the day regarding fundamental error and procedural default, I remain troubled by the degree regulation is undermining the right to remain silent which can result in jury-proof miscarriages of justice.