NUMBER 13-08-00292-CR 

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG 
                                                                                                                      

JESUS ROBERTO VILLARREAL 
A/K/A CARLOS WALDO,                                                            Appellant,

v.
 
THE STATE OF TEXAS,                                                     Appellee.
                                                                                                                       

On appeal from the 107th District Court 
of Cameron County, Texas.
                                                                                                                      

MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Rodriguez and Garza 
Memorandum Opinion by Justice Rodriguez


 
          Appellant Jesus Roberto Villarreal a/k/a Carlos Waldo was convicted of four counts
of aggravated robbery and two counts of aggravated assault with a deadly weapon.


 See
Tex. Penal Code Ann. § 22.02(a)(2) (Vernon Supp. 2009), § 29.03(a)(2) (Vernon 2003). 
After a jury found him guilty, the trial court assessed punishment at confinement in the
Texas Department of Criminal Justice–Institutional Division for sixty years. By five issues,
Villarreal complains that: (1) the State committed a Doyle violation, see Doyle v. Ohio, 426
U.S. 610, 611 (1976); (2) the trial court erred in admitting impeachment testimony; (3) he
was denied his right to counsel; (4) there was prosecutorial misconduct; and (5) there was
insufficient non-accomplice evidence. We affirm.
I. Background
          In December 2005, a robbery occurred at each of the following locations in
Brownsville, Texas: Sally's Beauty Supply, Ultimo Taco, and Bed Bath & Beyond. The first
robbery was on December 5, 2005, at Sally's Beauty Supply. Heidi Rosenbaum, who was
working as a cashier at Sally's Beauty Supply, gave money to a man who was wearing a
black hoody, a hat, black pants, and something covering his nose. The man told her "to
give him the money" and showed her a gun that he had under his jacket. Rosenbaum
testified that all she could see was the man's eyes, which were unique in that they were
"slanted down." A co-worker also gave money to this man. The money taken from Sally's
Beauty Supply totaled about $540. At trial, Rosenbaum identified Villarreal as the person
who committed the robbery. She also testified that, after reviewing approximately thirty
photographs, she had identified Villarreal in a photo lineup. The photo lineup was
admitted, without objection, as State's Exhibit 29.
          The next robbery occurred on December 10, 2005, at Ultimo Taco. Armando Curiel,
the manager of the restaurant, testified that he saw a car pull into the parking lot and park
facing an exit. Two masked men, one taller and the other much shorter, rapidly entered
the restaurant shooting their firearms—one had a pistol, the other a rifle. Alicia Curiel,
Armando's wife, was working as a cashier at the restaurant. The men demanded money,
and when Alicia could not open the money drawer, they took the whole drawer. Armando
attempted to pursue the robbers who were driving a gold car, but he lost them. At trial,
Armando described the car as a gold Stratus. Armando testified that he was unable to
identify the men who entered the restaurant and robbed him. Alicia's testimony was
consistent with that of her husband. She, too, was unable to identify the men who entered
the restaurant that night, except that one was tall and the other short and that the short one
had black eyebrows.
          The last robbery took place at Bed Bath & Beyond on December 18, 2005. Adelina
Rios was working as a cashier when two men—one larger or heavier and one
smaller—entered the store and discharged their firearms. The smaller man, whose face
was covered by a mesh cloth like pantyhose, ordered her to give them money from the
cash register. At trial, Rios described this man's eyes as follows: "Bushy eyebrows, dark
brown eyes; and on his right eye, it looked kind of like a lazy eye, droopiness." After
providing the description of his eyes, Rios testified that she saw the same set of eyes in
the courtroom and identified Villarreal as one of the persons who robbed Bed Bath &
Beyond that day.


 Rios also identified a piece of cloth—a mesh material that had a black
lining—that looked similar to what the robber was wearing over his nose to conceal his
identity. This item was admitted as State's Exhibit 39.
          Dean Davila testified that he and Christina Villarreal were customers in Bed Bath
& Beyond when he saw two men wearing dark clothes and masks and carrying weapons
enter the store. Davila and Christina attempted to slowly walk off to the side of a counter. 
As they did so, one of the men pointed a gun at them and asked where they thought they
were going. Davila told him that he and Christina were "going to the floor" because "we
don't want any trouble." Davila was unable to identify Villarreal as one of the two persons
who committed the offense. Christina's testimony was similar to Davila's testimony. She,
too, was unable to identify either of the two individuals who committed the offenses at Bed
Bath & Beyond.
          Villarreal was arrested at the home of an acquaintance, Teresa Medders who
testified as follows:
●         Medders knew "Jesse" or Jesus Villarreal, and she also knew Benito Gonzalez.
 
●         Villarreal stayed with Medders "off and on" at her apartment during December 2005.
 
●         Villarreal left his clothing at her apartment sometimes.
 
●         Villarreal and Gonzalez were friends.
 
●         Medders saw Villarreal at her apartment with a small handgun. She told him that
she did not want the gun there.
 
●         Medders also saw Gonzalez with a gun at her apartment.
 
●         On one occasion, Villarreal and Gonzalez came to Medders's apartment wearing
dark clothes. They went into the bathroom where Medders overheard them talking
about "Sally's" and "not going to the same place twice." When they came out of the
bathroom, Villarreal gave her around $400 cash to help pay the rent. When she
asked about the money, Villarreal told her not to worry about it.
 
●         One week later, Villarreal and Gonzalez came to her apartment again, and while
they were in the bathroom, she heard them complaining that they did not have
enough money or did not get enough money.
 
●         Gonzalez, who borrowed Medders's mother's car, was involved in an accident with
the car and a school bus and was arrested.
 
●         After Villarreal found out that Gonzalez had been arrested, he was upset and
furious. Villarreal told Medders that he wanted to leave town.
 
●         Medders identified State's Exhibit 39 as her "[t]high high, torn thigh high, or cut off,
cut, ripped, and torn" pantyhose. The piece of clothing was found in her apartment.
 
●         After being shown a portion of the Bed Bath & Beyond robbery videotape, Medders
recognized the hats worn by the men. She also testified that the jacket with a stripe
on it looked familiar. The hat with a gray stripe had been a Christmas gift to her
from her father. The hats were found in her apartment.
 
●         Medders had no criminal charges lodged against her.

          Gonzalez testified at trial that he was "doing time" for, among other things, the
offenses at issue in this case and had entered into an agreement with the State to testify
at Villarreal's trial. He testified that Villarreal, whom Gonzalez referred to as "Jesse," went
into Sally's Beauty Supply on December 3, 2005. He was not sure if "Jesse" was in the
store for longer than two to five minutes. Gonzalez stated that, because he was on drugs,
he could not "remember real good" who was with him at the Ultimo Taco restaurant on
December 10, 2005, but both went into the restaurant, "[s]tuck up the place," and drove
off together. Gonzalez also testified that on December 18, 2005, "Jesse" was with him at
Bed Bath & Beyond when he walked in, "shot up the place," and asked for money, which
he thought he got. Gonzalez testified that he also identified Villarreal in a photo lineup as
the other person he was with during the robberies and that he had written on the photo
"This is the guy robber." In addition, on December 21, 2005, Gonzalez gave a voluntary
statement to Officer Chris Ortiz, a detective with the Brownsville Police Department. In his
statement, Gonzalez implicated Villarreal in the robberies at Sally's Beauty Supply,
Ultimate Taco, and Bed Bath & Beyond. Gonzalez's statement was admitted, without
objection, as State's Exhibit 61.
II. DiscussionA. Post-Arrest Silence and Bolstering
          In his first issue, Villarreal contends that the State erred by commenting on his post-arrest silence. See Doyle, 426 U.S. at 611. Specifically, Villarreal argues that it was
improper for the State to ask Officer Alexander Marks whether the people who were
arrested when a search warrant was executed on Medders's apartment had given
statements to the police. The people arrested were Medders, Hugo Cervantes, and
Villarreal. Officer Marks responded that Medders and Cervantes had given statements. 
Villarreal alleges that, by this testimony, Officer Marks was implying that Villarreal did not
give a statement; thus, Officer Marks's testimony was a comment on his post-arrest
silence. Villarreal did not object to Officer Marks's testimony at trial.
          A comment on a defendant's post-arrest silence violates the prohibition against
self-incrimination provided by the fifth amendment to the United States Constitution and
article I, section 10 of the Texas Constitution. Id. at 618; Dinkins v. State, 894 S.W.2d 330,
356 (Tex. Crim. App. 1995) (en banc); see U. S. Const. amend. V; Tex. Const. art. I, § 10. 
A comment on a defendant's post-arrest silence is akin to a comment on his failure to
testify at trial in that it attempts to raise an inference of guilt arising from the invocation of
a constitutional right. Dinkins, 894 S.W.2d at 356.
          A timely and reasonably specific objection, followed by an adverse ruling, is required
to preserve error—even constitutional error—for appellate review. See Tex. R. App. P.
33.1(a); Heidelberg v. State, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004). "[A]
defendant's right to remain silent and not have that silence used against him at trial has
long been considered a forfeitable trial right." Miller v. State, 939 S.W.2d 681, 689 (Tex.
App.–El Paso 1996, no pet.) (citing Wheatfall v. State, 882 S.W.2d 829, 836 (Tex. Crim.
App. 1994) (en banc)); see also Teeter v. State, No. 13-07-00578-CR, 2009 Tex. App.
LEXIS 5668, at *52-53 (Tex. App.–Corpus Christi July 23, 2009, no pet.) (mem. op., not
designated for publication). Consequently, a defendant must object in order to preserve
complaints concerning the admission of evidence showing his pre- and post-arrest silence. 
Wheatfall, 882 S.W.2d at 836; Smith v. State, 721 S.W.2d 844, 855 (Tex. Crim. App.
1986); Cisneros v. State, 692 S.W.2d 78, 83 (Tex. Crim. App. 1985) (en banc) (all holding
that a defendant's complaints concerning pre- and post-arrest silence testimony are waived
in the absence of an objection). Villarreal did not object at trial to the testimony about
which he now complains. Accordingly, we hold that error, if any, was not preserved for
review.
          Villarreal also contends in his first issue, in the alternative, that Officer Marks's
testimony amounted to impermissible bolstering of Medders's testimony because it
"elevated her in the eyes of the jury" by showing that she was willing to make a statement. 
Again, however, because Villarreal did not object on this ground at trial, he has not
preserved error for our review. See Tex. R. App. P. 33.1(a); Stone v. State, 583 S.W.2d
410, 414 (Tex. Crim. App. 1979) (concluding that the appellant waived a bolstering issue
when he objected on the ground of invading the province of the jury and bolstering, but the
bolstering objection was not made until after the answer was given). Having concluded
that error was not preserved on either basis, we overrule Villarreal's first issue.
B. Right to Counsel
          Villarreal complains by his second issue that he was denied his right to trial counsel
of his choice because his retained counsel, Everardo Garcia, was not his counsel at trial. 
On the morning of trial, Moises Salas, not Garcia, announced ready for trial. Salas
appeared as Villarreal's counsel and tried the case. There is no indication in the record as
to why Garcia was not there or why Salas was there. These questions, however, are
irrelevant because Villarreal raised no objection to Salas's appearance as his counsel at
trial. See Tex. R. App. P. 33.1(a). Therefore, this argument is waived, and, on that basis,
we overrule Villarreal's second issue.
C. Prior Inconsistent Statement
          Villarreal contends by his third issue that State's Exhibit 61, the sworn statement of
Gonzalez admitted into evidence and published to the jury, is hearsay. However, a
hearsay objection was not made at the time the statement was offered. An objection is
required to preserve error in the admission of hearsay evidence; otherwise, the error is not
preserved and may not be complained of on appeal. See id.; Moore v. State, 935 S.W.2d
124, 130 (Tex. Crim. App. 1996) (en banc) ("[A]ll existing authority holds the admission of
hearsay must be preserved with a timely and specific objection to the evidence.").
          Villarreal also asserts that, during its direct examination of Gonzalez, the State
improperly impeached Gonzalez by introducing evidence of a prior inconsistent statement. 
Again, no objection to improper impeachment appears in the record during this testimony
or when the statement was admitted as a trial exhibit. An objection is required to preserve
this type of error. See e.g., In re A.B., 133 S.W.3d 869, 875 (Tex. App.–Dallas 2005, no
pet.) (holding that, after a hearsay objection was sustained in a juvenile proceeding, the
party did not preserve error because she failed to object to an improper impeachment). 
Therefore, this asserted error has not been preserved for our review. We overrule
Villarreal's third issue.
D. Prosecutorial Misconduct
          In his fourth issue, Villarreal alleges that numerous instances of prosecutorial
misconduct cumulatively affected his right to due process and a fair trial. He claims that
this allegedly pervasive prosecutorial misconduct requires a reversal and rendition of
acquittal. Villarreal asserts that the prosecutor engaged in prosecutorial misconduct during
his closing argument when he argued that: (1) the jury should send a message to the
public; (2) Villarreal was fleeing; (3) Villarreal was found inside a gold Stratus in 2007 when
he was not; and (4) Villarreal possessed a gun.
          Prosecutorial jury argument should generally be limited to: (1) summation of the
evidence; (2) reasonable deductions from the evidence; (3) answer to argument of
opposing counsel; and (4) pleas for law enforcement. Cannon v. State, 668 S.W.2d 401,
404 (Tex. Crim. App. 1984) (en banc); Lawson v. State, 896 S.W.2d 828, 833 (Tex.
App.–Corpus Christi 1995, writ ref'd). To preserve jury argument error, the defendant
must: (1) make a timely and specific objection; (2) request an instruction that the jury
disregard the matter improperly placed before it; and (3) move for a mistrial. See Cockrell
v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (en banc); see also Torres v. State,
No. 13-08-080 CR, 2009 Tex. App. LEXIS 6609, at *3 (Tex. App.–Corpus Christi Aug. 24,
2009, no pet.) (mem. op., not designated for publication).
          The State made the following plea during its closing argument:
It's the end of our case, ladies and gentlemen. At this time I ask you to do
your job. I ask you to send a message to others who will be reckless, who
will be driven to steal and cheat and injure and even possibly kill someone,
that this type of crime will not be tolerated by the citizens of Cameron
County. And this is what will happen to you, that they will be found guilty.
The prosecutor's argument was focused on the jury as a representative of the community
and the deterrence of such actions. See Flowers v. State, 124 S.W.3d 801, 804 (Tex.
App.–Houston [1st Dist.] 2003, pet. ref'd); Rivera v. State, 82 S.W.3d 64, 69 (Tex.
App.–San Antonio 2002, pet. ref'd). The request to "send a message" is proper jury
argument.


 See Rivera, 82 S.W.3d at 69; Cannon, 668 S.W.2d at 404; Lawson, 896
S.W.2d at 833.
          Villarreal also challenges the prosecutor's conduct when he made statements about
Villarreal fleeing.


 We conclude, however, that these statements were reasonable
deductions from Medders's testimony that Villarreal told her that "[h]e wanted to leave
town" when they found out Gonzalez had been arrested. See Cannon, 668 S.W.2d at 404;
Lawson, 896 S.W.2d at 833. Therefore it, too, was a proper prosecutorial jury argument. 
See Cannon, 668 S.W.2d at 404; Lawson, 896 S.W.2d at 833.
          Finally, as to the prosecutor's argument regarding the gun, Villarreal did not object
to this argument, request an instruction, and move for a mistrial. See Cockrell, 933 S.W.2d
at 89. Likewise, Villarreal did not object to the prosecutor's arguments regarding the gold
Stratus, request an instruction, and move for a mistrial.


 See id. Therefore, we conclude
that, by not objecting, Villarreal failed to preserve any error as to these arguments. See
Tex. R. App. P. 33.1(a)(1); Cockrell, 933 S.W.2d at 89.
          Because Villarreal has failed to demonstrate the existence of pervasive
prosecutorial misconduct, we need not address his broad allegation that numerous
instances of prosecutorial misconduct cumulatively affected his right to due process and
a fair trial. See Tex. R. App. P. 47.1. We overrule Villarreal's fourth issue.
E. Accomplice-Witness Testimony
          By his fifth and final issue, describing both Gonzalez and Medders as accomplices,
Villarreal contends that there is nothing but accomplice testimony to convict him, and
therefore, the evidence is insufficient to establish that he was the "other man" involved in
the robberies. We disagree.
           "An accomplice is someone who participates with the defendant before, during, or
after the commission of a crime and acts with the required culpable mental state." Brown
v. State, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). Here, it is undisputed that
Gonzalez, who participated in the crimes and who was subsequently convicted in
accordance with a plea agreement for his participation, is an accomplice as a matter of law. 
See id. The jury was instructed that Gonzalez was an accomplice witness; however, it was
given no instruction concerning Medder's status. A careful examination of appellant's brief
and the record before us does not reflect that Villarreal ever requested that the jury be so
charged. Because the issue was not submitted to the jury and because Villarreal now
premises his fifth issue on Medders being an accomplice, it is necessary for us to
determine if Medders, who had no criminal charges lodged against her, is an accomplice
witness as a matter of law. See Caraway v. State, 550 S.W.2d 699, 702 (Tex. Crim. App.
1977).
          The record in this case does not reflect any affirmative act on Medders's part to
assist in, plan, promote, or encourage the offenses, and the record does not reflect that
Medders had the requisite intent to do so. See Brown, 270 S.W.3d 567. Moreover, even
if Medders suspected or even knew that Villarreal was involved in the robberies and did not
disclose that information, without more, we could not conclude that she was an accomplice
witness. See Kunkle v. State, 771 S.W.2d 435, 439-40 (Tex. Crim. App. 1986) (setting out
that a witness does not become an accomplice merely because she knew about the
offense and failed to disclose it). In addition, the facts that Medders was present at her
apartment when Villarreal and Gonzalez were there around the time of the robberies, that
she accepted money from Villarreal to help pay her rent, and that some of the clothing
worn during the robberies belonged to Medders and was found at her apartment do not
compel the conclusion that she is an accomplice witness. See Caraway, 550 S.W.2d at
703. Therefore, based on the above, we conclude that Medders is not an accomplice
witness as a matter of law. See id. at 702-03.
          We next address Villarreal's contention that the non-accomplice evidence is
insufficient to corroborate Gonzalez's testimony. "Article 38.14 [of the Texas Code of
Criminal Procedure] provides that a defendant cannot be convicted of an offense upon the
testimony of an accomplice without other corroborating evidence 'tending to connect' the
defendant to the offense." Simmons v. State, 282 S.W.3d 504, 508 & n.5 (Tex. Crim. App.
2009) (quoting Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005)). In determining the
sufficiency of non-accomplice evidence to corroborate accomplice testimony, the proper
appellate standard is "whether a rational fact-finder could conclude that the non-accomplice evidence tends to connect appellant to the offense." Id. at 509; Brown, 270
S.W.3d at 567 (explaining that the accomplice-witness rule "requires that, before a
conviction may rest upon the testimony of an accomplice witness, the accomplice's
testimony must be corroborated by independent evidence tending to connect the accused
with the crime"). Non-accomplice evidence must not be taken as isolated facts, but rather
considered together as a whole, and if the force of the evidence is such, as a whole, that
it tends to connect the defendant to the offense, then it is sufficient. Simmons, 282 S.W.3d
at 511. "The corroborative evidence, however, need not be sufficient in itself to establish
guilt, nor must it directly link the accused to the commission of the offense." Brown, 270
S.W.3d at 567. "We view the evidence in the light most favorable to the jury's verdict." Id.
          Medders's testimony established that Villarreal stayed at her apartment "off and on"
during December 2005. On one occasion, Villarreal and Gonzalez arrived at her apartment
wearing dark clothes and went into the bathroom together where she overheard them
talking about "Sally's" and "not going to the same place twice." Later that evening,
Villarreal gave Medders about $400 cash. She also testified that after Villarreal found out
Gonzalez had been arrested, he was furious and told her that he wanted to leave town. 
Medders further testified that she recognized some of the clothing worn by the men shown
on the videotape of the robbery at Bed Bath & Beyond; the jacket looked familiar and the
hat seen in the videotape was a gift to her from her father and was found in her apartment.
          In addition, Rios, one of the victims from the Bed Bath & Beyond robbery, described
the eyes of one of robbers and, after doing so, testified that they were Villarreal's eyes. 
Rios also identified a piece of cloth, State's Exhibit 39, that looked similar to what the
robber was wearing over his nose to conceal his identity. This was the same exhibit that
Medders identified as the "[t]high high, torn thigh high, or cut off, cut, ripped, and torn"
pantyhose found in her apartment. At trial, Rosenbaum, the cashier at Sally's Beauty
Supply, also identified Villarreal as one of the robbers. She had earlier identified Villarreal
from a photo lineup by the distinctive feature of his eyes. Finally, Armando, the manager
of the Ultimo Taco, testified that he recognized a "golden" Stratus as the vehicle the
robbers used. There was evidence that Villarreal's driver's license was found in a gold
Dodge Stratus a year later.
          In sum, one of the victims positively identified Villarreal as being one of the robbers
at Sally's Beauty Supply; another victim identified Villarreal as one of the robbers at Bed
Bath & Beyond. Villarreal's driver's license was found in a gold Dodge Stratus, matching
the description of the vehicle used by the robbers at the Ultimo Taco robbery. There was
physical evidence—Medders's hat and torn pantyhose—connecting Villarreal, who was in
and out of Medders's apartment during the relevant time period, to the scene of the robbery
at Bed Bath & Beyond. Finally, Villarreal's talking with Gonzalez about "Sally's" and "not
going to the same place twice," giving Medders money for rent that same evening, and
telling Medders he needed to leave town after Gonzalez was arrested, corroborates
Gonzalez's testimony. See Brown, 270 S.W.3d at 568 (citing Killough v. State, 718 S.W.2d
708, 711 (Tex. Crim. App. 1986) (en banc) (holding that sufficient accomplice-witness
corroboration may be furnished by the suspicious conduct of a defendant)). Thus,
considering the non-accomplice evidence together as a whole while viewing the evidence
in the light most favorable to the jury's verdict, we conclude that a rational fact-finder could
have concluded that the non-accomplice evidence tended to connect Villarreal to the
offenses. See Simmons, 282 S.W.3d at 508, 511; Brown, 270 S.W.3d at 567. We
overrule Villarreal's fifth issue.
III. Conclusion
          Having overruled all issues, we affirm the judgment of the trial court.
 
NELDA V. RODRIGUEZ
                                                                           Justice
 
Do not publish. 
Tex. R. App. P. 47.2(b).
 
Delivered and filed the
4th day of March, 2010.