

NUMBER 13-07-00578-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

LOUIS WAYNE TEETER,                                                        Appellant,

v.

THE STATE OF TEXAS,                                                        Appellee.

On appeal from the 214th District Court
of Nueces County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Benavides
Memorandum Opinion by Chief Justice Valdez**

Appellant, Louis Wayne Teeter, appeals a jury conviction for the offenses of: (1) attempted capital murder, a first-degree felony, *see* TEX. PENAL CODE ANN. § 15.01 (Vernon 2003); *id.* § 19.03 (Vernon Supp. 2008); (2,3) aggravated assault on two sheriff's deputies, first-degree felonies, *see id.* §§ 22.01(a)(1), 22.02(a)(2) (Vernon Supp. 2008); and (4) violation of a protective order, a third-degree felony, *see id.* § 25.07(a) (Vernon Supp.

2008).  In seven issues, which we consider out of order, Teeter asserts that he was afforded ineffective assistance of trial counsel, assails several portions of the jury charge, and challenges the sufficiency of the evidence supporting his conviction.  We affirm.

## I. BACKGROUND

At approximately 12:50 a.m. on February 25, 2007, Nueces County Sheriff's Deputies Thomas Burnside and Dana Richardson were dispatched to a domestic disturbance at Teeter's ranch.

### A.    The Domestic Disturbance

Deborah Wright, Teeter's live-in girlfriend of four months at the time of the disturbance, testified as to her relationship with Teeter.  Wright testified that in November 2007, shortly before she moved in with Teeter, he shot her in the foot, and afterwards, he threatened to shoot himself.  In an effort to convince Teeter to take her to the hospital and to prevent him from committing suicide, Wright proposed telling others that the gunshot wound was an accident and was self-inflicted.  Teeter agreed to take Wright to the hospital, and she told police officers, hospital employees, friends, and family that she had accidentally shot herself.

Wright also testified about the events leading up to the 911 call that summoned the authorities.  Wright stated that on the evening of February 24, she was cleaning the kitchen and waiting for her teenage daughter, M.W., to return home from a friend's house when Teeter entered the house "slurring, staggering[,] belligerent, [and] mad drunk."  He demanded sex from Wright, but she refused.  Teeter then beat Wright and forced her to perform oral sex.  Wright testified that Teeter beat her for approximately ten to fifteen minutes, until M.W. returned home.  When M.W. entered the home, Wright asked her to call 911.  As M.W. phoned 911, Wright gathered some of her belongings, which included

2

her pet Chihuahua, puppies, some clothing, and dog food.

M.W. testified that although she had an 11:00 p.m. curfew, she arrived home at Teeter's ranch around 1:00 a.m. on February 25. When she entered the house, M.W. "saw [Teeter], and [her] mom was on the—like in the kitchen, kind of on the floor." Teeter was only "partially" dressed, and there was blood on his arms, but M.W. did not know whose blood it was. M.W. testified that her mother was "frantic" and "scared," and Teeter was acting "[k]ind of mad, kind of calm." Wright asked M.W. to call 911 because Teeter had beaten her.

Shortly thereafter, Wright saw a sheriff's patrol car arrive, and she and M.W. met the deputies on the driveway, near the street. M.W. testified that "it wasn't really pitch black outside," so M.W. and Wright were able to see when the police arrived.

## B.     The Encounter at the Gate

Upon arriving at the scene, Deputies Burnside and Richardson parked their patrol car near a locked gate that extended across Teeter's caliche driveway. Soon after exiting the car, the deputies saw Wright and M.W. "hurrying" along the driveway towards the gate. Deputy Burnside testified that Wright stayed alongside the driveway as though she was "trying to hide."

The deputies asked the women to unlock the gate. When Wright approached the deputies, Deputy Burnside noticed scratches on her neck and face, and "believed she was intoxicated to some extent." Wright appeared agitated and kept saying, "We've got to get out of here, he's going to kill us." The deputies told the women that they were safe and questioned them.

A few minutes later, Teeter drove to the gate in a white diesel pick-up truck and parked about ten feet behind the gate. Deputy Richardson shined a spotlight on the

3

driveway. Deputy Burnside testified that Teeter exited his truck, leaving the engine running and the headlights on, and approached the gate.[1] Deputy Richardson told Teeter that they were investigating a disturbance and needed to speak to him. Teeter commented that the women needed to "get out of there" because he owned the property and did not want them there anymore. Teeter refused to allow the deputies onto his property, and the deputies described his behavior as "hostile."

Deputy Richardson testified that as he spoke to him, Teeter would move towards the gate and then back away. Deputy Richardson could smell alcohol on Teeter, and his speech was slurred. Deputy Richardson asked Teeter to open the gate and furnish the officers with identification, but Teeter refused.[2] While trying to communicate with Teeter, Deputy Richardson asked Deputy Burnside if there were any signs of injury on Wright. Deputy Burnside responded affirmatively. Deputy Richardson testified that when there is evidence of family violence, the department policy is to arrest the suspect involved. Deputy Richardson testified that upon hearing of Wright's injuries, he decided to arrest Teeter and informed Teeter that they were going to arrest him. He again asked Teeter to open the gate, but Teeter refused and told the deputies that they were not coming on to his property without a warrant.

Sergeant Don Watt, a shift supervisor, then arrived on the scene. Sergeant Watt testified that Deputy Burnside briefed him on the situation, and Teeter appeared "agitated,

---

[1] Deputy Richardson was not able to recall whether the headlights and engine were on.

[2] Deputy Burnside testified that at this point, he placed his hand on a fence pole, as if to cross the fence. Teeter threatened that if Deputy Burnside came onto his property, it was going to be "the biggest mistake of [his] life." At that point, Deputy Burnside backed away from the fence, and he and Deputy Richardson unsnapped their holsters and covered their guns. Deputy Richardson's testimony does not recount this event, and when asked whether Teeter threatened the deputies, Deputy Richardson testified that he could not remember any specific threats, only general threats to stay off the property.

4

intoxicated, belligerent, [and] loud." Sergeant Watt asked for Teeter's side of the story, but Teeter did not give any information. After Sergeant Watt "delineated everything that [he] was going to do and tr[ied] to resolve this thing in a peaceful manner," he decided to make an arrest, and he motioned for Deputy Burnside to cross the fence. After Burnside crossed the fence, Teeter ran towards his truck. Deputy Richardson and Sergeant Watt crossed over the fence and joined the pursuit.

## C.     The Pursuit

*1. Deputy Burnside*

Deputy Burnside testified that as soon as Teeter saw him cross the fence, Teeter ran to his truck. Deputy Burnside followed Teeter and tried to grab him and prevent him from getting into the truck. Teeter jumped into the truck through the open driver's side door and started "pushing" and "shoving" Deputy Burnside. By this time, Deputy Richardson was behind Deputy Burnside assisting him in apprehending Teeter. Teeter then shifted the truck into reverse and pressed the gas. The tires spun, throwing caliche, and Teeter continued to resist the officers. As the truck moved backwards down the driveway, Deputy Burnside stood or knelt in the door jamb and tried to pull Teeter from the truck.

Deputy Burnside tried to shift the truck into park, but Teeter continued to push and shove him. When the truck momentarily stopped, Sergeant Watt stepped to the driver's side of the truck and pepper-sprayed Teeter. The spray had little effect; Teeter's physical resistance escalated, and he punched and kicked the deputies. The truck then accelerated in reverse.

Deputy Burnside drew his ASP baton "to try to hit [Teeter] on the arms and hands

5

to get him to break loose of the steering wheel." Teeter, with an "almost demonic look" reached down with his right hand between the driver's seat and the center console. Deputy Burnside reached across Teeter, grabbed Teeter's right hand with both hands, and pulled Teeter's hand free of the seat. But as he pulled, the truck continued to reverse and Deputy Burnside fell backwards. While he was falling off of the truck, Deputy Burnside turned the steering wheel so as to steer the truck off the caliche driveway and onto the grass. As the front wheels turned, Deputy Burnside fell backwards and landed on the grass next to the driveway. Deputy Burnside's legs were run over by the truck as it rolled onto the grass.

The truck stopped a few feet away, and Deputy Burnside tried to make his way back over to it. Seconds later, he heard gunshots, and he saw Sergeant Watt standing on the caliche driveway with his gun drawn. Believing that Teeter had fired, Deputy Burnside drew his gun and fired once at Teeter. Deputy Burnside heard Teeter say, "[t]hat's enough," and the deputies stopped firing. Teeter exited the truck, and Deputy Burnside handcuffed him and removed a knife from Teeter's belt. Deputy Burnside testified that his injuries consisted of a knee strain, pulled cartilage, bone bruises on his left knee, and a cracked right ankle. He also testified that the truck was used as a deadly weapon.

*2. Deputy Richardson*

Deputy Richardson testified that upon seeing Sergeant Watt motion Deputy Burnside over the fence, he followed. Teeter ran, and Sergeant Watt yelled to get Teeter before he got into the truck. Teeter, however, got into the driver's side of the truck. As Deputy Richardson approached the truck, Deputy Burnside straddled in and out of the driver's side doorframe, and he tried to pull Teeter out. Deputy Richardson positioned

6

himself on the right side of Deputy Burnside and "yanked" on Teeter to get him out of the vehicle.

Teeter shifted the truck into reverse, and it backed up. Deputy Richardson opined that Teeter slammed on the accelerator because the back tires spun and the engine "revved up." The driver's side door was fully open, and Deputy Burnside "wedged" himself in the driver's side door jamb. Teeter held onto the steering wheel to prevent the deputies from pulling him out. The truck then accelerated backwards at a high rate of speed and, although Deputy Richardson was knocked away from the truck, Deputy Burnside remained wedged in the door jamb.

As the truck reversed, it would momentarily stop. The first time the truck stopped, Deputy Richardson caught up to it and hit Teeter with a closed fist. The truck again started to reverse, and Richardson was again thrown back. Deputy Richardson caught up to the truck, only to be thrown back again, three or four times. Upon Deputy Richardson's final approach to the truck, he saw Deputy Burnside fall to the ground and then saw the truck run over Deputy Burnside's legs. The truck then stopped.

Although Deputy Richardson was unable to recall whether the interior or headlights of the truck were on at this point, he testified that there was sufficient lighting to view the events as they unfolded. The State introduced evidence that a light attached to a utility pole was near the portion of the driveway where Teeter allegedly ran over Deputy Burnside, indicating that a light at the top of the pole might have illuminated the area on the night in question.

Deputy Richardson jogged toward the passenger window of the truck and saw Teeter lean over and come up with a revolver, but he was not sure which hand held the

gun. Teeter fully extended his arm and pointed the gun at the windshield in the direction of Sergeant Watt. Deputy Richardson yelled, "gun," dropped his ASP baton, drew his gun, and fired approximately seven shots at Teeter. Deputy Richardson further testified that: (1) he was the first deputy to fire; (2) he had no doubt that Teeter intended to kill Sergeant Watt; (3) the gun Teeter was carrying was classified as a firearm, and it was a deadly weapon; (4) Teeter used his truck as a deadly weapon; (5) Teeter injured Deputy Burnside by running over him with his truck; and (6) Teeter acted intentionally or knowingly.

*3. Sergeant Watt*

Sergeant Watt testified that he jumped over the fence after Deputy Burnside began to pursue Teeter. By the time Sergeant Watt reached the truck, Teeter was rapidly reversing. Deputy Burnside was "half in and half out" of the open driver's side door, and his legs where dragging along the side of the truck. Sergeant Watt ran to try to catch up with the truck. The truck then went "out of gear and lost its motive power and stopped." Sergeant Watt testified that Teeter did not stop the truck "on his own accord" and that the actions of Deputy Burnside likely caused the truck to stop. Upon reaching the driver's side of the truck, Sergeant Watt sprayed Teeter with pepper spray. The canister of pepper spray was knocked out of his hand and the truck accelerated in reverse. Sergeant Watt was knocked away from the truck by the door as the truck reversed down the driveway. The truck stopped a second time, and all of the officers tried to no avail to pull Teeter out of the truck. The truck again reversed. As the truck neared Teeter's house, Sergeant Watt saw Deputy Burnside fall to the side of the truck. Sergeant Watt estimated that when deputy Burnside fell, the truck had traveled approximately 400 feet along the driveway.

8

The truck then stopped a third and final time. Sergeant Watt saw Deputy Burnside stand up, try to put weight on his leg, and then struggle to regain balance. Sergeant Watt approached the truck, and when he was "right in front of the headlight," he saw Teeter holding a pistol in his left hand and pointing it at him with the gun positioned between the windshield and the open door of the truck. Sergeant Watt drew his gun and fired at Teeter. Sergeant Watt testified that: (1) he fired his gun because he believed that he was going to get "shot and/or killed;" (2) he never heard Deputy Richardson yell, "gun;" (3) he shot first; (4) he did not hear Deputy Richardson shoot first; (5) the gun pointed by Teeter was a deadly weapon; and (6) the way Teeter was driving the truck made it a deadly weapon. Additionally, Sergeant Watt testified that although there were no lights along the driveway, and he did not believe that the headlights of Teeter's truck were on, the night was not "pitch black" because "there was some ambient light." Additionally, he testified that when the truck stopped the final time, it was close to the house, and the lighting from the house provided additional lighting for the officers.

## D.     The Protective Order

The State presented evidence that on February 3, 2006, Teeter's ex-wife, Susan Teeter, obtained a protective order against Teeter. The protective order was not limited to the protection of Susan, but instead prohibited "family violence." A witness for the State testified that family violence is defined as "[a]n act by a member of a family or household that is intended to result in physical harm, bodily injury, assault, sexual assault, or that is a threat." The protective order also prohibited "dating violence." The State's witness defined dating violence as "violence against anyone of any sex in which you have a dating

9

relationship." Although the protective order was in place on the night of the February 25, 2007 disturbance, the officers on the scene were not aware of it when they made the decision to arrest Teeter.

## E.     The Judgment

On July 30, 2007, the jury assessed punishment at: (1) thirty years' imprisonment for the attempted capital murder of Sergeant Watt; (2) twenty years' imprisonment for the aggravated assault of Sergeant Watt; (3) twenty years' imprisonment for the aggravated assault of Deputy Burnside; and (4) ten years' imprisonment for violation of a protective order. The sentences were ordered to run concurrently. Teeter filed a motion for new trial, and a hearing on the motion was held on October 11, 2007. At the hearing on the motion for new trial, Teeter argued that reasonable doubt existed as to all counts and that the aggravated assault of Sergeant Watt was a lesser-included offense of the attempted capital murder of Sergeant Watt. The trial court denied the motion for new trial. This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

## A.     Standards of Review

In conducting a legal sufficiency review, a reviewing court must ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (emphasis in original)). We do not reevaluate the weight and credibility of the evidence, and we do not substitute

our own judgment for the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). Instead, we consider whether the jury reached a rational decision. *Beckham*, 29 S.W.3d at 151. We must resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, we review the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or the jury's verdict is against the great weight and preponderance of the evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). We will not reverse the jury's verdict unless we can say with some objective basis in the record that the great weight and preponderance of the evidence contradicts the verdict. *Id.* at 417.

## B.      Aggravated Assault of Deputy Burnside

*1. Applicable Law*

In his fourth issue, Teeter contends that the evidence is legally and factually insufficient to support his conviction of aggravated assault on Deputy Burnside. Under section 22.01 of the Texas Penal Code, a person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." TEX. PENAL CODE ANN. § 22.01(a)(1). A person commits aggravated assault if he commits assault and causes serious bodily injury to another or uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. § 22.02(a)(1), (2). An offense under this section is a felony of the first degree if the offense was committed against a person the actor knows

11

is a public servant while the public servant is lawfully discharging an official duty as a public servant. *See id.* § 22.02(b)(2)(B). The actor is presumed to have known the person assaulted was a public servant if the person was wearing a distinctive uniform or badge indicating the person's employment as a public servant. *Id.* § 22.02(c).

A "deadly weapon" is a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury, or anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (Vernon 2003). An object that is generally not considered a dangerous weapon may become so, depending on the manner in which it is used during the commission of an offense. *Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991). Factors to consider in making this determination include: the size, shape, and sharpness of the object; the manner of its use or intended use; the nature or existence of inflicted wounds; evidence of the object's life-threatening capabilities; the physical proximity between the victim and the object; and any words spoken by the one using the object. *See, e.g., id.*, 821 S.W.2d at 619-20.

Under the Penal Code,

A person acts recklessly, or reckless, with respect to . . . the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the . . . result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE ANN. § 6.03(c) (Vernon 2003). In order to determine whether Teeter had the requisite mental state, we examine his conduct to determine whether:

12

(1) the alleged act or omission, viewed objectively at the time of its commission, created a "substantial and unjustifiable" risk of the type of harm that occurred;

(2) that risk was of such a magnitude that disregard of it constituted a gross deviation from the standard of care that a reasonable person would have exercised in the same situation (i.e., it involved an "extreme degree of risk, considering the probability and magnitude of the potential harm to others")[;]

(3) the defendant was consciously aware of that "substantial and unjustifiable" risk at the time of the conduct; and

(4) the defendant consciously disregarded that risk.

*Williams v. State*, 235 S.W.3d 742, 755-56 (Tex. Crim. App. 2007) (internal footnotes omitted).

*2. Analysis*

The testimony of the officers that responded to the domestic disturbance call, as well as the testimony of Wright and M.W., established that Teeter accelerated in reverse down his driveway at a high rate of speed. The jury heard testimony that Teeter's truck was a Chevy 350 diesel truck, was being used to evade arrest, and that Deputy Burnside was half inside and half outside the truck as it traveled approximately 400 feet in reverse. Deputy Burnside testified that, while perched precariously in the door jamb of the truck, he attempted to pull Teeter's hand from between the seat cushion and console. Although he succeeded in removing Teeter's hand from that location, he lost his balance and fell from the truck. The jury heard testimony from Deputy Burnside and Deputy Richardson that after Deputy Burnside fell, his legs were run over by the front tires of Teeter's truck. Further, the jury heard testimony that Teeter attempted to push the officers away from his

13

person, and consequently out of the truck, in order to avoid arrest.

Viewed in the light most favorable to the verdict, from the testimony and facts surrounding the event, a rational trier of fact could have inferred that Teeter was aware of, but consciously disregarded, the risk of serious bodily injury to Deputy Burnside when he drove in reverse with Deputy Burnside hanging out of the driver's side door of his truck. Moreover, in considering the size of the truck, the speed the truck was driven in reverse, and Deputy Burnside's proximity to the truck, a rational juror could have found Teeter's truck to be a deadly weapon. *See Thomas*, 821 S.W.2d at 619-20. We hold that a rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. Therefore, the evidence was legally sufficient to support Teeter's conviction.

We also conclude the evidence was factually sufficient to support the jury's finding. Evidence contrary to Teeter's finding of guilt included the cross-examination testimony of Deputy Burnside where the deputy stated that he "lost balance and fell off" the truck. He also testified that "there was no intent" or attempt by Teeter to run over him. Deputy Burnside admitted that Teeter never attempted to run over him. The clothing that Deputy Burnside wore on the night of the event was never examined by police and was not introduced into evidence. Additionally, although Sergeant Watt saw that Deputy Burnside appeared to be injured, he did not see Teeter's truck run over Deputy Burnside's legs.

However, viewing the evidence in a neutral light, we cannot conclude that the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or that the jury's verdict is against the great weight and preponderance of the evidence.

14

*Watson*, 204 S.W.3d at 414-15. We conclude that the evidence is factually sufficient to support Teeter's conviction of the aggravated assault of Deputy Burnside. Teeter's fourth issue is overruled.

## C. Attempted Capital Murder of Sergeant Watt

In his seventh issue, Teeter contends that the evidence is legally and factually insufficient to support his conviction of attempted capital murder of Sergeant Watt. Specifically, Teeter claims that there is no evidence that he "had the specific intent to commit the offense of capital murder against Don Watt."

*1. Applicable Law*

A person commits the offense of attempted capital murder if, with the specific intent to commit a capital murder, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended. *See* TEX. PENAL CODE ANN. §§ 15.01(a), 19.03(a)(7)(A). A person commits capital murder if he intentionally or knowingly causes the death of a peace officer acting in the lawful discharge of an official duty, knowing that the person is a peace officer. *See id.* §§ 19.02(b)(1), 19.03(a)(1). A specific intent to kill is a necessary element of attempted murder. *Flanagan v. State*, 675 S.W.2d 734, 741 (Tex. Crim. App. 1984).

*2. Analysis*

Teeter argues that there was no evidence presented at trial that shows that his "conscience objective or desire" was to commit capital murder. Teeter contends that the evidence presented shows that he lacked the specific intent to commit capital murder

15

because: (1) he was retreating by reversing his truck down his driveway; (2) no blood or fingerprints were found on his gun; (3) the gun was recovered from the passenger floorboard of the truck and not from his hand; and (4) he never fired his gun.

The specific intent to kill may be inferred from the use of a deadly weapon, unless the manner of its use makes it reasonably apparent that death or serious bodily injury could not have resulted. *See Godsey v. State*, 719 S.W.2d 578, 580-81 (Tex. Crim. App. 1986); *Flanagan*, 675 S.W.2d at 743. There are a number of factors that could have led a jury to reasonably believe Teeter's conduct was knowing or intentional, including: (1) Deputy Burnside's testimony that he pulled Teeter's hand from in between the console and seat of the truck before falling to the ground; (2) Sergeant Watt's and Deputy Richardson's testimony that Teeter pointed a gun at Sergeant Watt; and (3) Deputy Richardson's testimony that Teeter's arm was fully extended as he pointed the gun at Sergeant Watt.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Teeter had the specific intent to commit capital murder against Sergeant Watt. *See Laster*, 275 S.W.3d at 524. Therefore, the evidence was legally sufficient to support Teeter's conviction.

Additionally, we find that the evidence is factually sufficient. Sergeant Watt testified that he was "right in front of the headlight," when he saw Teeter holding a pistol in his left hand and pointing it at him with the gun positioned between the windshield and the door of the truck. Benny Hill, a defense witness, and Phillip Cunningham, a private investigator hired by Teeter, testified that, based on an examination of shell casings, Sergeant Watt could not have been as close to Teeter's truck as he claimed. Moreover, jurors heard

16

conflicting testimony regarding whether the headlights or dome lights of Teeter's truck were on at the time the officers allege that Teeter pointed a gun at Sergeant Watt. The jury also heard conflicting testimony as to the amount of light along Teeter's driveway on the night of the incident. However, "[t]he jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). In resolving conflicts in the evidence, a jury "may accept one version of facts and reject another or reject any of a witness' testimony." *Baker v. State*, 986 S.W.2d 271, 276 (Tex. App.–Texarkana 1998, pet. ref'd).

Viewing the evidence in a neutral light, we conclude that the evidence is not so weak that the jury's verdict seems clearly wrong and manifestly unjust, and that the jury's verdict is not against the great weight and preponderance of the evidence. *Watson*, 204 S.W.3d at 414-15. We conclude that the evidence is legally and factually sufficient to support Teeter's attempted capital murder conviction. We overrule Teeter's seventh issue.

## III. FAILURE TO INSTRUCT ABSENT A REQUEST

In his second issue, Teeter argues that he was egregiously harmed by the trial court's failure to *sua sponte* instruct the jury, at both the guilt-innocence and punishment phases of trial, on its need to find that extraneous offenses had occurred beyond a reasonable doubt before considering them.

### A. Applicable Law

Article 37.07 section 3(a)(1) of the code of criminal procedure provides, in relevant part, that:

17

[E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible . . . .

TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (Vernon Supp. 2008).

## B. Charge at Guilt-Innocence

Article 37.07, section 3(a)(1) does not apply to extraneous offense evidence at the guilt-innocence phase of trial. *See Delgado v. State*, 235 S.W.3d 244, 252 (Tex. Crim. App. 2007). Accordingly, a trial court must include a reasonable doubt instruction in the guilt-innocence charge only upon request. *See id.* at 254. Because Teeter did not request the instruction, no error occurred in the trial court's failure at guilt-innocence to instruct the jury on the State's burden of proof concerning extraneous offenses. *See id.* Issue two is overruled insofar as it relates to the guilt-innocence phase of Teeter's trial.

## C. Charge at Punishment

*1. Standard of Review*

The State may offer punishment-phase evidence as to any matter the court deems relevant to sentencing, including evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1). When evidence of extraneous offenses or bad acts is admitted during the punishment phase, the trial court is required to instruct the jury *sua sponte* on the reasonable doubt standard of proof. *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000). Although "the guilt-innocence stage requires the jury to find the

18

defendant guilty beyond a reasonable doubt of each element of the offense, the punishment phase requires the jury only find that these prior acts are attributable to the defendant beyond a reasonable doubt." *Haley v. State*, 173 S.W.3d 510, 515 (Tex. Crim. App. 2005).

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). First, we examine the jury charge to determine whether error occurred. *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003) (en banc). Second, if we find that the trial court erred, we must determine if the harm is sufficient to warrant reversal. *Id.*; *Abdnor*, 871 S.W.2d at 731-32. The degree of harm necessary for reversal depends on whether the error was preserved. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

In the absence of a request or objection, jury charge error does not require reversal unless it causes "egregious harm." *See Huizar*, 12 S.W.3d at 484-85. Egregious harm is present whenever a reviewing court finds that the error made the case for punishment clearly and significantly more persuasive. *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991). Errors resulting in egregious harm are those which affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *Almanza v. State*, 686 S.W.2d 157, 172 (Tex. Crim. App. 1984) (op. on reh'g).

Teeter argues that a trial court must give an instruction on the burden of proof for evidence of extraneous offenses to a jury assessing punishment, and that failure to do so requires reversal. It is undisputed that the trial court had a duty to give a burden of proof instruction relating to extraneous offenses admitted during the punishment phase. *See*

*Huizar*, 12 S.W.3d at 484. Therefore, the issue in this case is not error, but whether the harm rises to the level of reversible error. In determining whether lack of an instruction caused egregious harm, we consider the following four factors: (1) "the entire jury charge," (2) "the state of the evidence, including the contested issues and weight of probative evidence," (3) "the argument of counsel," and (4) "any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

*2.      Analysis*

During the guilt-innocence phase of trial, the State elicited testimony from Deputy Burnside that, upon arriving at Teeter's ranch in the early morning hours of February 25, 2007, Wright told him that approximately three months earlier, Teeter shot her in the foot. This statement immediately drew an objection from Teeter's counsel that was sustained by the trial court. During direct examination, Wright testified, without objection, that Teeter shot her in the foot on Thanksgiving Day. On cross examination by Teeter, Wright admitted that she told the police, people at the hospital, and her friends and family, that she had accidentally shot herself. She also testified that Teeter took her to the hospital for treatment of the gunshot wound, and that she moved in with Teeter three days after sustaining the injury. Additionally, Wright testified that Teeter had waved a gun at her on prior occasions.

At the punishment phase, Wright again testified that she had been shot in the foot by Teeter. The State also called Teeter's ex-wife, Susan, to testify as to the events that

led her to obtain a protective order.[3] Susan testified that: (1) Teeter slapped and kicked her on one occasion; (2) Teeter used his truck to "try to run [her] off the road" one day while she was driving from Home Depot with their daughters; (3) one day while she was stopped at a stop sign, Teeter and their daughters drove up beside her, and Teeter pointed a gun at her; (4) during their marriage, Teeter would hit her when they argued and "basically throw [her] out of the house and tell her to leave or he was going to get his gun and kill [her]"; and (5) on another occasion, he threatened to kill her by saying, "I'm going to put a f***ing bullet in your head and I'm going to slit your throat where you sit." The jury also heard testimony that on one occasion, Teeter threatened and pulled the hair of a tenant of one of his properties. No objections were made to the admission of these extraneous offenses.

Although the jury charge did not contain a reasonable doubt instruction, Teeter's trial counsel affirmatively stated that he had no objection to the jury charge. Additionally, Teeter does not explain why the admission of these offenses was particularly harmful, except to say that there was egregious harm because "the jury received absolutely no instruction on how to handle the extraneous offenses." In order to determine whether egregious harm exists, we turn to an analysis of the four *Almanza* factors. *See id.*

In reviewing a case for egregious harm, we first look at the jury instructions as a whole. *Hutch*, 922 S.W.2d at 171. Here, the charging document did not instruct the jury that it must find, beyond a reasonable doubt, that Teeter committed the extraneous offenses. The jury charge on punishment advised the jury that its decision "must be based

---

[3] In Count Four, the jury found that Teeter violated the protective order "by intentionally or knowingly committing an assault against Deborah Wright."

21

on the law in this charge and upon your consideration of the facts and circumstances shown by the evidence in this case." It also stated that the jurors could consider "evidence admitted at both stages of this trial."

By failing to instruct the jury of the burden of proof required before extraneous offenses may be considered, and by instructing the jury to "consider evidence admitted at both stages of this trial," it is possible that the jury considered the extraneous offenses complained of by Teeter in its assessment of punishment without knowing that it first had to find that Teeter committed those offenses beyond a reasonable doubt. *See Colburn v. State*, 966 S.W.2d 511, 520 (Tex. Crim. App. 1998) (noting that a presumption exists that a jury follows the jury instructions). Therefore, jurors may have considered the extraneous offenses improperly because of the charging document. Accordingly, we cannot say that any harm from the omission of the instruction is removed or lessened by the jury charge as a whole. *See Olivas v. State*, 202 S.W.3d 137, 146-47 (Tex. Crim. App. 2006).

We next consider the weight of the probative evidence and the contested issues. *See Almanza*, 686 S.W.2d at 171. There is no egregious harm where the evidence presented to the jury supports a finding in accordance with the appropriate burden of proof. *See Olivas*, 202 S.W.3d at 147. For example, there is no egregious harm if the extraneous offense is uncontested or if the State presents sufficient evidence to support a jury finding beyond a reasonable doubt. *See id.*

Some harm could have resulted when the jury heard Wright's testimony that Teeter shot her in the foot on a prior occasion. In light of the fact that Teeter contested shooting Wright, it is difficult to determine whether the jury would have found the evidence of the

prior shooting sufficient to support a finding beyond a reasonable doubt. If the jury chose to believe Wright, her testimony could have proven, beyond a reasonable doubt, that she had previously been shot by Teeter. However, if the jury chose not to credit Wright's testimony, it is unlikely that the state would have met its burden. We conclude that testimony of the previous shooting did not, by itself, rise to the level of egregious harm. Therefore, we continue our *Almanza* analysis. *See Almanza*, 686 S.W.2d at 171.

With the exception of evidence that Teeter previously shot Wright in the foot, the evidence presented to the jury could support a finding that Teeter committed each of the additional extraneous offenses beyond a reasonable doubt. Teeter does not argue that the evidence was insufficient to prove that he committed the additional extraneous acts; therefore, the State's evidence concerning the additional extraneous acts is substantially uncontroverted. *See Yates v. State*, 917 S.W.2d 915, 923 (Tex. App.–Corpus Christi 1996, pet. ref'd); *see also Arnold v. State*, 7 S.W.3d 832, 835 (Tex. App.–Eastland 1999, pet. ref'd) (holding defendant not egregiously harmed by court's failure to instruct because, among other factors, defendant did not contend evidence was insufficient to prove beyond a reasonable doubt he had committed extraneous offenses, but only that instruction was not given). Additionally, nothing in the record indicates that the jury would have disregarded the extraneous acts even if a reasonable doubt instruction had been given. *See Arnold*, 7 S.W.3d at 835.

Under the third *Almanza* factor, we consider the arguments of counsel. *Almanza*, 686 S.W.2d at 171. In its closing argument, the State's argument regarding the extraneous offenses was as follows:

> You've heard all the things that this Court has heard already before it found that he had committed acts of family violence and he was a threat of future violence. Well, this Court signed this piece of paper that prohibited him from committing further acts of violence.
>
> You also heard M[r]s. Teeter get up here and testify to those acts. And I think the more substantial ones are all the threats you heard, the pointing of the gun in front of his children, pointing a gun at Mrs. Teeter, trying to run over his wife with his children in the car at Home Depot. So you heard about that. And what's unique about that is that this piece of paper was not able to protect. This court order was not able to protect us from his violence. Instead he continued on his path of violence.
>
> You have heard how he continued to harass Susan Teeter. And in fact, if you look in the protective order, she said up on the stand he was not allowed to harass and annoy me, among other things; and he continued to do that. You also heard how he shot Deborah Wright in the foot. And that's where I think we have—that's what makes it interesting.
>
> So they're asking you to do another—give him a gift of probation. Let this paper of probation protect us from further acts. And that's where we respectfully disagree . . . .

Although the State used the extraneous offense evidence to argue that probation should not be granted, the State also spoke of the violent acts that the jury had already found that Teeter committed. The State reminded the jury that Teeter had beaten Wright, dragged Deputy Burnside 400 feet, and pointed a gun at Sergeant Watt.

Under the fourth *Almanza* factor, we consider other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171. One important consideration is whether the jury would have imposed the same punishment even if it had been properly instructed. *Allen*, 253 S.W.3d at 267-68. The jury assessed thirty years out of a possible life sentence for Count One, twenty years out of a possible life sentence for Counts Two and Three, and ten years out of a possible ten-year sentence for Count Four,

24

with all sentences to run concurrently. The jury's assessment of punishment was within the low to mid-range of punishment for counts one through three, and therefore demonstrates lack of egregious harm to Teeter. *See Allen v. State*, 47 S.W.3d 47, 53 (Tex. App.–Fort Worth 2001, pet. ref'd) (reasoning jury's sentence was within range of punishment for attempted murder and, therefore, did not demonstrate "egregious harm" to defendant).

After conducting an *Almanza* review, we cannot conclude that Teeter was denied a fair and impartial trial. Although some harm may have resulted from the error, it was not egregious because the State's case was not made clearly and significantly more persuasive by the error. *See Saunders*, 817 S.W.2d at 692. Accordingly, we overrule Teeter's second issue.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In his first issue, Teeter contends that he received ineffective assistance of counsel because his trial counsel failed to object to the introduction of extraneous offenses in the guilt-innocence phase of the trial, failed to move for mistrial, failed to request a Rule 403 balancing test, failed to request a limiting instruction at the time the evidence was admitted, and failed to request a charge from the court. Specifically, Teeter contends that counsel was ineffective for failing to object (1) when Deputy Burnside testified that Teeter shot Wright three months prior to the charged offense, and (2) when Wright testified that Teeter shot her on a previous occasion.[4]

---

[4] Although Teeter contends that "numerous" extraneous offenses were introduced, he cites us to only two such offenses. Accordingly, we address only these two extraneous offenses. TEX. R. APP. P. 38.1(i) (providing that "the brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."). Additionally, although Teeter states that counsel was

## A.    Standard of Review

Although the constitutional right to counsel ensures the right to reasonably effective counsel, it does not guarantee errorless counsel whose competency or accuracy of representation is to be judged by hindsight. *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003). To prove ineffective assistance of counsel, Teeter must show that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's error, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005); *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.–Corpus Christi 2006, no pet.). A failure to make a showing under either prong of the *Strickland* standard defeats a claim of ineffective assistance of counsel. *Rylander*, 101 S.W.3d at 110-11.

An appellant must prove his claim of ineffective assistance of counsel by a preponderance of the evidence. *Stafford v. State*, 813 S.W.2d 503, 506 n.1 (Tex. Crim. App. 1991). An appellate court's review of defense counsel's representation is highly deferential, and we presume that counsel's actions fell within the wide range of reasonable and professional assistance. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008). Allegations of ineffective assistance of counsel must be firmly founded in the record. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The record must sufficiently demonstrate that the acts

ineffective for failing to "request a charge from the court," he fails to adequately argue this point on appeal. We therefore do not address this argument. *See id.*

26

or omissions of counsel were not the product of strategic decisions; if the record is silent as to any explanation for counsel's actions, a reviewing court will find that the defendant has failed to overcome the strong presumption of reasonable assistance "unless the challenged conduct was so outrageous that no competent attorney would have engaged in it." *Morales*, 253 S.W.3d at 696-97 (quoting *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005)); *see Thompson*, 9 S.W.3d at 814; *Jaynes*, 216 S.W.3d at 851. "These demanding standards are virtually impossible to meet when no proper evidentiary record was developed at a hearing on a motion for new trial." *Chavero v. State*, 36 S.W.3d 688, 701 (Tex. App.–Corpus Christi 2001, no pet.).

## B. Analysis

Teeter does not meet the first prong of *Strickland* because the record is undeveloped. Although Teeter filed a motion for new trial, upon which a hearing was held, he failed to argue ineffective assistance of counsel in his motion or at the hearing. "'[T]rial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective.'" *Goodspeed*, 187 S.W.3d at 392 (quoting *Rylander*, 101 S.W.3d at 111). When the record is silent as to counsel's motivations, we presume that counsel provided reasonable assistance. *See Morales*, 253 S.W.3d at 696-97.

Teeter contends that counsel was ineffective for failing to object to the introduction of the extraneous offenses of shooting Wright in the foot and waving a gun at her on a separate occasion. Review of the record indicates that the prior shooting was first brought up on the direct examination of Deputy Burnside. Trial counsel immediately objected to the introduction of this offense, and the trial court sustained the objection. However, when

27

Wright took the stand, trial counsel did not object when she testified about the shooting. Additionally, trial counsel did not object when the State referred to the shooting during its closing argument at the guilt-innocence stage of trial. Although counsel failed to object, reasonable trial strategy could have justified trial counsel's conduct.

After Wright testified that she had been shot in the foot by Teeter, defense counsel cross-examined her about her injury. Wright admitted that after sustaining her injury, she told hospital officials, the police, and even her family and friends that she had shot herself. She also admitted that she moved in with Teeter three days after she alleged that he shot her. Trial counsel might have wanted Wright's testimony about the shooting and waving of the gun to be heard in an attempt to discredit her as a witness. Thus, without a record of counsel's reasons for his conduct in this case, we cannot say Teeter has overcome the presumption that trial counsel's actions were based on sound trial strategy. *See Strickland*, 466 U.S. at 689.

## V. DOUBLE JEOPARDY

In his third issue, Teeter contends that his convictions for the aggravated assault and attempted capital murder of Sergeant Watt constitute double jeopardy.

### A. Standard of Review and Applicable Law

"The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, protects an accused . . . . [F]rom being punished more than once for the same offense." *Littrell v. State*, 271 S.W.3d 273, 275 (Tex. Crim. App. 2008). "In the multiple-punishments context, two offenses may be the same if one

28

offense stands in relation to the other as a lesser-included offense, or if the two offenses are defined under distinct statutory provisions but the Legislature has made it clear that only one punishment is intended." *Id.* at 275-76.

Under the Texas Code of Criminal Procedure, an offense is a lesser-included offense if: (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense. TEX. CRIM. PROC. ANN. art. 37.09 (Vernon 2006). "[T]he facts required" in Article 37.09(1) is a question of law that can be answered by looking at the elements and facts alleged in the charging instrument. *See Hall v. State*, 225 S.W.3d 524, 535 (Tex. Crim. App. 2007).

We must begin our analysis by determining whether the aggravated assault of Sergeant Watt is a lesser-included offense of the attempted capital murder of Sergeant Watt. *See Littrell*, 271 S.W.3d at 276. "We make that determination as a matter of state law 'by comparing the elements of the greater offense, as the State pled it in the indictment, with the elements of the statute that defines the lesser offense.'" *Id.* (citing *Hall*, 225 S.W.3d at 525). If the aggravated assault is a lesser-included offense, we presume that the offenses are the same for double jeopardy purposes and that Teeter may not be punished for both. *See Littrell*, 271 S.W.3d at 276. "The second question, in that event,

is whether the Legislature has clearly expressed a contrary intention that the accused should in fact be punished for both the greater and the lesser-included offenses." *Id.*

## B.    Analysis

Because Teeter's trial counsel did not object to a double jeopardy violation at trial, we first address the threshold issue of preservation. A double jeopardy violation may be raised for the first time on appeal if the violation is clearly apparent on the face of the record and when enforcement of the usual rules of procedural default would serve no legitimate state interest. *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim. App. 2000). "In cases where the trial court either knew or should have known of the jeopardy problem, no purpose is served in enforcing the state procedural rule and the defendant may assert this interest after trial." *Honeycutt v. State*, 82 S.W.3d 545, 547 (Tex. App.–San Antonio 2002, pet. ref'd) (citations omitted). "[W]here a defendant is charged in the same indictment with two counts, and assuming one count is a lesser-included offense of the other, the error is apparent on the face of the record." *Id.* Here, the same indictment charges Teeter in Count One with attempted capital murder of Sergeant Watt and in Count Two, with aggravated assault of Sergeant Watt. Thus, if Count Two is a lesser-included offense of Count One, any error would be apparent on the face of the record. *See Rangel v. State*, 179 S.W.3d 64, 70 (Tex. App.–San Antonio 2005, pet. ref'd). We are required to "retain the conviction with the most serious punishment," and vacate any remaining convictions that are the "same" for double jeopardy purposes. *Landers v. State*, 957 S.W.2d 558, 559 (Tex. Crim. App. 1997). Because Teeter was convicted on Counts One and Two, a successful double jeopardy challenge would not require a retrial or remand to

a trial court. Therefore, enforcement of the usual rules of procedural default would serve no legitimate state interest.

Teeter contends that "[i]t is undisputed that [a]ggravated [a]ssault is a lesser included offense of attempted capital murder." We disagree. Teeter supports his contention by citing an opinion in which the court of criminal appeals states that "[a]ggravated assault . . . [is] a lesser included offense[] of attempted murder and attempted capital murder." *Godsey v. State*, 719 S.W.2d 578, 584 (Tex. Crim. App. 1986). However, this statement is inconsistent with the court's later holding in *Hall v. State.* 225 S.W.3d at 536-37 (finding that aggravated assault was not a lesser-included offense of murder as charged in the indictment where aggravated assault required proof of the additional requirements of threat and display of a deadly weapon). According to *Hall*, a court determines whether an offense is a lesser-included offense by looking to the indictment and comparing the elements required to establish each offense. *See id.* at 535-36. An offense will be deemed lesser-included where the facts required are the same as, or less than, all the facts required to establish the commission of the greater offense. *See id.* at 535-36.

Additionally, we have held that aggravated assault is not a lesser-included offense of attempted capital murder. *See Douglas v. State*, 915 S.W.2d 166, 169 (Tex. App.–Corpus Christi 1996, no pet.). In *Douglas*, the defendant was charged by indictment with attempted capital murder. *Id.* However, in addition to an instruction on attempted capital murder, the jury charge contained an instruction on aggravated assault. *Id.* Although the jury did not find the defendant guilty of attempted capital murder, it convicted

31

him of aggravated assault. *Id.* On appeal, the defendant argued that the jury should not have been given an instruction on aggravated assault because it was not a lesser-included offense of attempted capital murder as charged in the indictment. *Id.* After comparing the facts required to establish attempted capital murder set forth in the indictment with facts required of aggravated assault set forth in the jury charge, we determined that aggravated assault was not a lesser-included offense because it, unlike attempted capital murder, required proof of threat. *Id.*

Consistent with *Hall* and *Douglas*, in determining whether aggravated assault is a lesser-included offense, we consider the statutory elements of attempted capital murder as modified by the particular allegations in Count One of Teeter's indictment:

(1) Teeter;

(2) with the specific intent to commit the offense of capital murder against Don Watt;

(3) intentionally and knowingly pointed a gun at Don Watt;

(4) this act amounted to more than mere preparation which tended but failed to effect the commission of said offense;

(5) Don Watt was a peace officer acting in the lawful discharge of an official duty;

(6) Teeter knew that Don Watt was a peace officer.

We then compare them with the statutory elements of aggravated assault as modified by the particular allegations in Count Two of Teeter's indictment:

(1) Teeter;

(2) intentionally or knowingly threatened Don Watt with imminent bodily injury by using a deadly weapon;

(3) Don Watt was lawfully discharging an official duty;

(4) Teeter knew that Don Watt was a peace officer.

We find that the elements of aggravated assault are not "established by proof of the same or less than all the facts required to establish the commission" of attempted capital murder. *See Hall*, 225 S.W.3d at 536-37. The charge of aggravated assault in Teeter's indictment requires proof of a threat, and thus requires proof of an element not required by the offense of attempted capital murder as charged in the indictment. *See Douglas*, 915 S.W.2d at 169; *see also Hall*, 225 S.W.3d at 536-37.

Because the offense of aggravated assault as pled in Count Two of Teeter's indictment is not a lesser-included offense of attempted capital murder as pled in Count One, error is not apparent on the face of the record, and therefore the issue of double jeopardy is not properly before this Court. *See Rangel*, 179 S.W.3d at 70. Accordingly, Teeter's third issue is overruled.

## VI. JURY CHARGE

In his fifth issue, Teeter argues that the trial court incorrectly charged the jury on punishment when the trial judge mistakenly stated that Teeter would be eligible for parole after serving "one-third" of the sentence imposed when he should have said "one-half."

### A. Standard of Review

When we review a jury charge for error, our first inquiry is whether the alleged error was preserved. If so, any harm, regardless of the degree, is sufficient to require reversal

33

of the conviction. *Almanza*, 686 S.W.2d at 171. On the other hand, if no proper objection was made at trial, the accused must claim and show that the error was "fundamental" in order to obtain a reversal. *Id.* A reversal will be granted only if the error is so egregious and created such harm that he "has not had a fair and impartial trial." *Id.*

Egregious harm consists of errors affecting the very basis of the case or that deprive the defendant of a valuable right, vitally affect a defensive theory, or make the case for conviction or punishment clearly and significantly more persuasive. *Saunders*, 817 S.W.2d at 692. We determine harm in light of the entire jury charge, the state of the evidence, including contested issues and the weight of the probative evidence; the argument of counsel; and any other relevant information revealed by the record as a whole. *Mann v. State*, 964 S.W.2d 639, 641 (Tex. Crim. App. 1998); *Almanza*, 686 S.W.2d at 171.

## B.    Analysis

At punishment, the trial court read the portion concerning eligibility of parole as follows:

> Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals *one-third* of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn. Eligibility for parole does not guarantee that parole will be granted. (Emphasis added.)

In contrast, the written charge provided to the jury stated that the defendant "will not become eligible for parol[e] until the actual time served equals *one-half* of the sentence imposed or 30 years . . . ." (Emphasis added.)

Teeter did not object to the charge and thus failed to preserve error. In order to gain

reversal, he must show that such error amounted to egregious harm. *Abdnor*, 871 S.W.2d at 732 (citing *Almanza*, 686 S.W.2d at 171). Therefore, we must determine whether the trial court's misstatement that Teeter would be eligible for parole after serving one-third of his sentence, instead of one-half, caused egregious harm. Although the jury was incorrectly charged by the trial court's oral charge, they were properly instructed in the written jury charge. We find that the trial court's oral misstatement of parole eligibility did not cause egregious harm to Teeter because: (1) the incorrect parole eligibility guideline was only given when the trial court read the charge, and not in the written form; (2) the jury was instructed both by the oral and written jury charge that although they may consider the existence of parole, they were not to consider the manner in which parole may be applied to Teeter; (3) the remainder of the charge concerning eligibility of parole was read correctly; and (4) the jury was able to take the written charge with them to the jury room. Teeter's fifth issue is overruled.

## VII. POST-ARREST SILENCE

In his sixth issue, Teeter argues that the prosecutor erred by commenting on his post-arrest silence. Specifically, Teeter argues that the it was improper for the prosecutor to elicit the following testimony during the direct examination of Sergeant Edge, an investigator with the Nueces County Sheriff's Department:

[State's Counsel]:   Okay. Did you visit the Defendant in the hospital?

[Sergeant Edge]:   Yes.

Q:                Did you try to obtain a statement from him?

35

A:                    Yes, sir.

Teeter also argues that the following statements made during the State's closing argument were improper:

> Mr. Teeter was given the opportunity to tell the officers what took place, and he talked with them. He talked with Officer Richardson. He talked with Sergeant Watt. He was given the opportunity at any point to say, you know what, this was self defense, that she's the one who attacked me, she's the one who hurt me. Did he ever say that? Did he ever mention that?
>
> . . . .
>
> He was unwilling to do that and unwilling to tell the officers anything about his side of the story and unwilling to cooperate at all.

The State may not use an individual's post-arrest, post-*Miranda* silence against him. *See Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *Sanchez v. State*, 707 S.W.2d 575, 580 (Tex. Crim. App. 1986). However, a timely and reasonably specific objection, followed by an adverse ruling, is required to preserve error—even constitutional error—for appellate review. Tex. R. App. P. 33.1(a); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004). "[A] defendant's right to remain silent and not have that silence used against him at trial has long been considered a forfeitable trial right." *Miller v. State*, 939 S.W.2d 681, 689 (Tex. App.–El Paso 1996, no pet.) (citing *Wheatfall v. State*, 882 S.W.2d 829, 836 (Tex. Crim. App. 1994)). Teeter did not object to the post-arrest silence testimony about which he now complains. Accordingly, we hold that error, if any, was not preserved for review. Teeter's sixth issue is overruled.

## VIII. Conclusion

Having overruled all of Teeter's issues, we affirm the trial court's judgment.

                                          _____
                                          ROGELIO VALDEZ
                                          Chief Justice

Do Not Publish. Tex. R. App. P. 47.2(b)
Memorandum Opinion delivered and
filed this the 23rd day of July, 2009.