

NUMBER 13-08-00292-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

JESUS ROBERTO VILLARREAL
A/K/A CARLOS WALDO,                                              Appellant,

v.

THE STATE OF TEXAS,                                             Appellee.

On appeal from the 107th District Court
of Cameron County, Texas.

# MEMORANDUM OPINION

Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Rodriguez

Appellant Jesus Roberto Villarreal a/k/a Carlos Waldo was convicted of four counts of aggravated robbery and two counts of aggravated assault with a deadly weapon.[1] *See* TEX. PENAL CODE ANN. § 22.02(a)(2) (Vernon Supp. 2009), § 29.03(a)(2) (Vernon 2003). After a jury found him guilty, the trial court assessed punishment at confinement in the Texas Department of Criminal Justice–Institutional Division for sixty years. By five issues, Villarreal complains that: (1) the State committed a *Doyle* violation, *see Doyle v. Ohio*, 426 U.S. 610, 611 (1976); (2) the trial court erred in admitting impeachment testimony; (3) he was denied his right to counsel; (4) there was prosecutorial misconduct; and (5) there was insufficient non-accomplice evidence. We affirm.

## I. BACKGROUND

In December 2005, a robbery occurred at each of the following locations in Brownsville, Texas: Sally's Beauty Supply, Ultimo Taco, and Bed Bath & Beyond. The first robbery was on December 5, 2005, at Sally's Beauty Supply. Heidi Rosenbaum, who was working as a cashier at Sally's Beauty Supply, gave money to a man who was wearing a black hoody, a hat, black pants, and something covering his nose. The man told her "to give him the money" and showed her a gun that he had under his jacket. Rosenbaum testified that all she could see was the man's eyes, which were unique in that they were "slanted down." A co-worker also gave money to this man. The money taken from Sally's Beauty Supply totaled about $540. At trial, Rosenbaum identified Villarreal as the person who committed the robbery. She also testified that, after reviewing approximately thirty

---

[1]Villarreal was indicted on ten counts of aggravated robbery and three counts of aggravated assault with a deadly weapon. While Villarreal was found guilty of four counts of aggravated robbery and two counts of aggravated assault, he was found not guilty of two counts of robbery. The trial court also dismissed four counts of aggravated robbery and one count of aggravated assault.

photographs, she had identified Villarreal in a photo lineup. The photo lineup was admitted, without objection, as State's Exhibit 29.

The next robbery occurred on December 10, 2005, at Ultimo Taco. Armando Curiel, the manager of the restaurant, testified that he saw a car pull into the parking lot and park facing an exit. Two masked men, one taller and the other much shorter, rapidly entered the restaurant shooting their firearms—one had a pistol, the other a rifle. Alicia Curiel, Armando's wife, was working as a cashier at the restaurant. The men demanded money, and when Alicia could not open the money drawer, they took the whole drawer. Armando attempted to pursue the robbers who were driving a gold car, but he lost them. At trial, Armando described the car as a gold Stratus. Armando testified that he was unable to identify the men who entered the restaurant and robbed him. Alicia's testimony was consistent with that of her husband. She, too, was unable to identify the men who entered the restaurant that night, except that one was tall and the other short and that the short one had black eyebrows.

The last robbery took place at Bed Bath & Beyond on December 18, 2005. Adelina Rios was working as a cashier when two men—one larger or heavier and one smaller—entered the store and discharged their firearms. The smaller man, whose face was covered by a mesh cloth like pantyhose, ordered her to give them money from the cash register. At trial, Rios described this man's eyes as follows: "Bushy eyebrows, dark brown eyes; and on his right eye, it looked kind of like a lazy eye, droopiness." After providing the description of his eyes, Rios testified that she saw the same set of eyes in the courtroom and identified Villarreal as one of the persons who robbed Bed Bath &

3

Beyond that day.[2]  Rios also identified a piece of cloth—a mesh material that had a black lining—that looked similar to what the robber was wearing over his nose to conceal his identity.  This item was admitted as State's Exhibit 39.

Dean Davila testified that he and Christina Villarreal were customers in Bed Bath & Beyond when he saw two men wearing dark clothes and masks and carrying weapons enter the store.  Davila and Christina attempted to slowly walk off to the side of a counter.  As they did so, one of the men pointed a gun at them and asked where they thought they were going.  Davila told him that he and Christina were "going to the floor" because "we don't want any trouble."  Davila was unable to identify Villarreal as one of the two persons who committed the offense.  Christina's testimony was similar to Davila's testimony.  She, too, was unable to identify either of the two individuals who committed the offenses at Bed Bath & Beyond.

Villarreal was arrested at the home of an acquaintance, Teresa Medders who testified as follows:

- Medders knew "Jesse" or Jesus Villarreal, and she also knew Benito Gonzalez.

- Villarreal stayed with Medders "off and on" at her apartment during December 2005.

- Villarreal left his clothing at her apartment sometimes.

- Villarreal and Gonzalez were friends.

- Medders saw Villarreal at her apartment with a small handgun.  She told him that she did not want the gun there.

- Medders also saw Gonzalez with a gun at her apartment.

---

[2]In her statement to the police the day of the robbery, Rios described the robber's eyes as brown with bushy eyebrows and his left eye as crossed.  At trial, Rios testified that she never said "left" or "crossed," but rather that "it looked like flickering."

4

● On one occasion, Villarreal and Gonzalez came to Medders's apartment wearing dark clothes. They went into the bathroom where Medders overheard them talking about "Sally's" and "not going to the same place twice." When they came out of the bathroom, Villarreal gave her around $400 cash to help pay the rent. When she asked about the money, Villarreal told her not to worry about it.

● One week later, Villarreal and Gonzalez came to her apartment again, and while they were in the bathroom, she heard them complaining that they did not have enough money or did not get enough money.

● Gonzalez, who borrowed Medders's mother's car, was involved in an accident with the car and a school bus and was arrested.

● After Villarreal found out that Gonzalez had been arrested, he was upset and furious. Villarreal told Medders that he wanted to leave town.

● Medders identified State's Exhibit 39 as her "[t]high high, torn thigh high, or cut off, cut, ripped, and torn" pantyhose. The piece of clothing was found in her apartment.

● After being shown a portion of the Bed Bath & Beyond robbery videotape, Medders recognized the hats worn by the men. She also testified that the jacket with a stripe on it looked familiar. The hat with a gray stripe had been a Christmas gift to her from her father. The hats were found in her apartment.

● Medders had no criminal charges lodged against her.

Gonzalez testified at trial that he was "doing time" for, among other things, the offenses at issue in this case and had entered into an agreement with the State to testify at Villarreal's trial. He testified that Villarreal, whom Gonzalez referred to as "Jesse," went into Sally's Beauty Supply on December 3, 2005. He was not sure if "Jesse" was in the store for longer than two to five minutes. Gonzalez stated that, because he was on drugs, he could not "remember real good" who was with him at the Ultimo Taco restaurant on December 10, 2005, but both went into the restaurant, "[s]tuck up the place," and drove off together. Gonzalez also testified that on December 18, 2005, "Jesse" was with him at Bed Bath & Beyond when he walked in, "shot up the place," and asked for money, which

5

he thought he got. Gonzalez testified that he also identified Villarreal in a photo lineup as the other person he was with during the robberies and that he had written on the photo "This is the guy robber." In addition, on December 21, 2005, Gonzalez gave a voluntary statement to Officer Chris Ortiz, a detective with the Brownsville Police Department. In his statement, Gonzalez implicated Villarreal in the robberies at Sally's Beauty Supply, Ultimate Taco, and Bed Bath & Beyond. Gonzalez's statement was admitted, without objection, as State's Exhibit 61.

## II. Discussion

### A. Post-Arrest Silence and Bolstering

In his first issue, Villarreal contends that the State erred by commenting on his post-arrest silence. *See Doyle*, 426 U.S. at 611. Specifically, Villarreal argues that it was improper for the State to ask Officer Alexander Marks whether the people who were arrested when a search warrant was executed on Medders's apartment had given statements to the police. The people arrested were Medders, Hugo Cervantes, and Villarreal. Officer Marks responded that Medders and Cervantes had given statements. Villarreal alleges that, by this testimony, Officer Marks was implying that Villarreal did not give a statement; thus, Officer Marks's testimony was a comment on his post-arrest silence. Villarreal did not object to Officer Marks's testimony at trial.

A comment on a defendant's post-arrest silence violates the prohibition against self-incrimination provided by the fifth amendment to the United States Constitution and article I, section 10 of the Texas Constitution. *Id*. at 618; *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995) (en banc); *see* U. S. Const. amend. V; Tex. Const. art. I, § 10.

6

A comment on a defendant's post-arrest silence is akin to a comment on his failure to testify at trial in that it attempts to raise an inference of guilt arising from the invocation of a constitutional right. *Dinkins*, 894 S.W.2d at 356.

A timely and reasonably specific objection, followed by an adverse ruling, is required to preserve error—even constitutional error—for appellate review. *See* TEX. R. APP. P. 33.1(a); *Heidelberg v. State*, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004). "[A] defendant's right to remain silent and not have that silence used against him at trial has long been considered a forfeitable trial right." *Miller v. State*, 939 S.W.2d 681, 689 (Tex. App.–El Paso 1996, no pet.) (citing *Wheatfall v. State*, 882 S.W.2d 829, 836 (Tex. Crim. App. 1994) (en banc)); *see also Teeter v. State*, No. 13-07-00578-CR, 2009 Tex. App. LEXIS 5668, at *52-53 (Tex. App.–Corpus Christi July 23, 2009, no pet.) (mem. op., not designated for publication). Consequently, a defendant must object in order to preserve complaints concerning the admission of evidence showing his pre- and post-arrest silence. *Wheatfall*, 882 S.W.2d at 836; *Smith v. State*, 721 S.W.2d 844, 855 (Tex. Crim. App. 1986); *Cisneros v. State*, 692 S.W.2d 78, 83 (Tex. Crim. App. 1985) (en banc) (all holding that a defendant's complaints concerning pre- and post-arrest silence testimony are waived in the absence of an objection). Villarreal did not object at trial to the testimony about which he now complains. Accordingly, we hold that error, if any, was not preserved for review.

Villarreal also contends in his first issue, in the alternative, that Officer Marks's testimony amounted to impermissible bolstering of Medders's testimony because it "elevated her in the eyes of the jury" by showing that she was willing to make a statement.

Again, however, because Villarreal did not object on this ground at trial, he has not preserved error for our review. *See* TEX. R. APP. P. 33.1(a); *Stone v. State*, 583 S.W.2d 410, 414 (Tex. Crim. App. 1979) (concluding that the appellant waived a bolstering issue when he objected on the ground of invading the province of the jury and bolstering, but the bolstering objection was not made until after the answer was given). Having concluded that error was not preserved on either basis, we overrule Villarreal's first issue.

## B. Right to Counsel

Villarreal complains by his second issue that he was denied his right to trial counsel of his choice because his retained counsel, Everardo Garcia, was not his counsel at trial. On the morning of trial, Moises Salas, not Garcia, announced ready for trial. Salas appeared as Villarreal's counsel and tried the case. There is no indication in the record as to why Garcia was not there or why Salas was there. These questions, however, are irrelevant because Villarreal raised no objection to Salas's appearance as his counsel at trial. *See* TEX. R. APP. P. 33.1(a). Therefore, this argument is waived, and, on that basis, we overrule Villarreal's second issue.

## C. Prior Inconsistent Statement

Villarreal contends by his third issue that State's Exhibit 61, the sworn statement of Gonzalez admitted into evidence and published to the jury, is hearsay. However, a hearsay objection was not made at the time the statement was offered. An objection is required to preserve error in the admission of hearsay evidence; otherwise, the error is not preserved and may not be complained of on appeal. *See id*.; *Moore v. State*, 935 S.W.2d 124, 130 (Tex. Crim. App. 1996) (en banc) ("[A]ll existing authority holds the admission of hearsay must be preserved with a timely and specific objection to the evidence.").

Villarreal also asserts that, during its direct examination of Gonzalez, the State improperly impeached Gonzalez by introducing evidence of a prior inconsistent statement. Again, no objection to improper impeachment appears in the record during this testimony or when the statement was admitted as a trial exhibit. An objection is required to preserve this type of error. *See e.g., In re A.B.*, 133 S.W.3d 869, 875 (Tex. App.–Dallas 2005, no pet.) (holding that, after a hearsay objection was sustained in a juvenile proceeding, the party did not preserve error because she failed to object to an improper impeachment). Therefore, this asserted error has not been preserved for our review. We overrule Villarreal's third issue.

## D. Prosecutorial Misconduct

In his fourth issue, Villarreal alleges that numerous instances of prosecutorial misconduct cumulatively affected his right to due process and a fair trial. He claims that this allegedly pervasive prosecutorial misconduct requires a reversal and rendition of acquittal. Villarreal asserts that the prosecutor engaged in prosecutorial misconduct during his closing argument when he argued that: (1) the jury should send a message to the public; (2) Villarreal was fleeing; (3) Villarreal was found inside a gold Stratus in 2007 when he was not; and (4) Villarreal possessed a gun.

Prosecutorial jury argument should generally be limited to: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) answer to argument of opposing counsel; and (4) pleas for law enforcement. *Cannon v. State*, 668 S.W.2d 401, 404 (Tex. Crim. App. 1984) (en banc); *Lawson v. State*, 896 S.W.2d 828, 833 (Tex. App.–Corpus Christi 1995, writ ref'd). To preserve jury argument error, the defendant

9

must: (1) make a timely and specific objection; (2) request an instruction that the jury disregard the matter improperly placed before it; and (3) move for a mistrial. *See Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996) (en banc); *see also Torres v. State*, No. 13-08-080 CR, 2009 Tex. App. LEXIS 6609, at *3 (Tex. App.–Corpus Christi Aug. 24, 2009, no pet.) (mem. op., not designated for publication).

The State made the following plea during its closing argument:

It's the end of our case, ladies and gentlemen. At this time I ask you to do your job. I ask you to send a message to others who will be reckless, who will be driven to steal and cheat and injure and even possibly kill someone, that this type of crime will not be tolerated by the citizens of Cameron County. And this is what will happen to you, that they will be found guilty.

The prosecutor's argument was focused on the jury as a representative of the community and the deterrence of such actions. *See Flowers v. State*, 124 S.W.3d 801, 804 (Tex. App.–Houston [1st Dist.] 2003, pet. ref'd); *Rivera v. State*, 82 S.W.3d 64, 69 (Tex. App.–San Antonio 2002, pet. ref'd). The request to "send a message" is proper jury argument.[3] *See Rivera*, 82 S.W.3d at 69; *Cannon*, 668 S.W.2d at 404; *Lawson*, 896 S.W.2d at 833.

Villarreal also challenges the prosecutor's conduct when he made statements about Villarreal fleeing.[4] We conclude, however, that these statements were reasonable

---

[3]We also note that no objection was made to this argument. Therefore, even if we were to determine it was made in error, nothing was preserved for our review. *See* TEX. R. APP. P. 33.1(a)(1); *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

[4]The complained-of prosecutorial "fleeing" argument follows:

[Prosecutor:] These are all connectors of the defendant to these different crimes. And let's also remember how Benito took Medders'[s] car and later got arrested. This, of course, gets [Villarreal] all mad, [Villarreal] telling Medders that they need to get out of town. They needed to go. What? Why would they need to leave town? If somebody didn't do anything wrong, than why do you need to leave? Why would he need to run? Why? Because the defendant had a guilty conscience.

10

deductions from Medders's testimony that Villarreal told her that "[h]e wanted to leave town" when they found out Gonzalez had been arrested. *See Cannon*, 668 S.W.2d at 404; *Lawson*, 896 S.W.2d at 833. Therefore it, too, was a proper prosecutorial jury argument. *See Cannon*, 668 S.W.2d at 404; *Lawson*, 896 S.W.2d at 833.

Finally, as to the prosecutor's argument regarding the gun, Villarreal did not object to this argument, request an instruction, and move for a mistrial. *See Cockrell*, 933 S.W.2d at 89. Likewise, Villarreal did not object to the prosecutor's arguments regarding the gold Stratus, request an instruction, and move for a mistrial.[5] *See id*. Therefore, we conclude that, by not objecting, Villarreal failed to preserve any error as to these arguments. *See* TEX. R. APP. P. 33.1(a)(1); *Cockrell*, 933 S.W.2d at 89.

Because Villarreal has failed to demonstrate the existence of pervasive prosecutorial misconduct, we need not address his broad allegation that numerous instances of prosecutorial misconduct cumulatively affected his right to due process and a fair trial. *See* TEX. R. APP. P. 47.1. We overrule Villarreal's fourth issue.

---

But do you know that the Supreme Court of Texas had said that a person fleeing a crime indicates a guilty conscience, which may be one of the strongest indicators –

[Counsel for Villarreal]: I'm going to object, Your Honor. There's no evidence of fleeing any scene of any crime whatsoever. That was never offered into evidence, no testimony to that effect.

The Court: Overruled. Go ahead.

[5]At trial, after the prosecutor stated in closing arguments that an officer had searched a gold Dodge Stratus in September 2007 and found Villarreal's driver's license, Villarreal objected that there was no evidence that the gold Stratus searched in 2007 was the same gold Stratus allegedly involved in the robberies in 2005. This objection does not comport with the contentions now made on appeal that the prosecutor argued, in error, that Villarreal was found inside the gold Stratus in 2007 and that the testimony suggests that Villarreal was fleeing. For that reason, nothing regarding the prosecutor's comments about the Stratus has been preserved for review. *See Swain v. State*, 181 S.W.3d 359, 365 (Tex. Crim. App. 2005) (providing that error is not preserved when objections at trial differ from arguments made on appeal); *Denoso v. State*, 156 S.W.3d 166, 174 (Tex. App.–Corpus Christi 2005, pet. ref'd) (same).

### E. Accomplice-Witness Testimony

By his fifth and final issue, describing both Gonzalez and Medders as accomplices, Villarreal contends that there is nothing but accomplice testimony to convict him, and therefore, the evidence is insufficient to establish that he was the "other man" involved in the robberies. We disagree.

"An accomplice is someone who participates with the defendant before, during, or after the commission of a crime and acts with the required culpable mental state." *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008). Here, it is undisputed that Gonzalez, who participated in the crimes and who was subsequently convicted in accordance with a plea agreement for his participation, is an accomplice as a matter of law. *See id.* The jury was instructed that Gonzalez was an accomplice witness; however, it was given no instruction concerning Medder's status. A careful examination of appellant's brief and the record before us does not reflect that Villarreal ever requested that the jury be so charged. Because the issue was not submitted to the jury and because Villarreal now premises his fifth issue on Medders being an accomplice, it is necessary for us to determine if Medders, who had no criminal charges lodged against her, is an accomplice witness as a matter of law. *See Caraway v. State*, 550 S.W.2d 699, 702 (Tex. Crim. App. 1977).

The record in this case does not reflect any affirmative act on Medders's part to assist in, plan, promote, or encourage the offenses, and the record does not reflect that Medders had the requisite intent to do so. *See Brown*, 270 S.W.3d 567. Moreover, even if Medders suspected or even knew that Villarreal was involved in the robberies and did not

12

disclose that information, without more, we could not conclude that she was an accomplice witness. *See Kunkle v. State*, 771 S.W.2d 435, 439-40 (Tex. Crim. App. 1986) (setting out that a witness does not become an accomplice merely because she knew about the offense and failed to disclose it). In addition, the facts that Medders was present at her apartment when Villarreal and Gonzalez were there around the time of the robberies, that she accepted money from Villarreal to help pay her rent, and that some of the clothing worn during the robberies belonged to Medders and was found at her apartment do not compel the conclusion that she is an accomplice witness. *See Caraway*, 550 S.W.2d at 703. Therefore, based on the above, we conclude that Medders is not an accomplice witness as a matter of law. *See id*. at 702-03.

We next address Villarreal's contention that the non-accomplice evidence is insufficient to corroborate Gonzalez's testimony. "Article 38.14 [of the Texas Code of Criminal Procedure] provides that a defendant cannot be convicted of an offense upon the testimony of an accomplice without other corroborating evidence 'tending to connect' the defendant to the offense." *Simmons v. State*, 282 S.W.3d 504, 508 & n.5 (Tex. Crim. App. 2009) (quoting TEX. CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005)). In determining the sufficiency of non-accomplice evidence to corroborate accomplice testimony, the proper appellate standard is "whether a rational fact-finder could conclude that the non-accomplice evidence tends to connect appellant to the offense." *Id*. at 509; *Brown*, 270 S.W.3d at 567 (explaining that the accomplice-witness rule "requires that, before a conviction may rest upon the testimony of an accomplice witness, the accomplice's testimony must be corroborated by independent evidence tending to connect the accused

with the crime"). Non-accomplice evidence must not be taken as isolated facts, but rather considered together as a whole, and if the force of the evidence is such, as a whole, that it tends to connect the defendant to the offense, then it is sufficient. *Simmons*, 282 S.W.3d at 511. "The corroborative evidence, however, need not be sufficient in itself to establish guilt, nor must it directly link the accused to the commission of the offense." *Brown*, 270 S.W.3d at 567. "We view the evidence in the light most favorable to the jury's verdict." *Id*.

Medders's testimony established that Villarreal stayed at her apartment "off and on" during December 2005. On one occasion, Villarreal and Gonzalez arrived at her apartment wearing dark clothes and went into the bathroom together where she overheard them talking about "Sally's" and "not going to the same place twice." Later that evening, Villarreal gave Medders about $400 cash. She also testified that after Villarreal found out Gonzalez had been arrested, he was furious and told her that he wanted to leave town. Medders further testified that she recognized some of the clothing worn by the men shown on the videotape of the robbery at Bed Bath & Beyond; the jacket looked familiar and the hat seen in the videotape was a gift to her from her father and was found in her apartment.

In addition, Rios, one of the victims from the Bed Bath & Beyond robbery, described the eyes of one of robbers and, after doing so, testified that they were Villarreal's eyes. Rios also identified a piece of cloth, State's Exhibit 39, that looked similar to what the robber was wearing over his nose to conceal his identity. This was the same exhibit that Medders identified as the "[t]high high, torn thigh high, or cut off, cut, ripped, and torn" pantyhose found in her apartment. At trial, Rosenbaum, the cashier at Sally's Beauty Supply, also identified Villarreal as one of the robbers. She had earlier identified Villarreal

14

from a photo lineup by the distinctive feature of his eyes. Finally, Armando, the manager of the Ultimo Taco, testified that he recognized a "golden" Stratus as the vehicle the robbers used. There was evidence that Villarreal's driver's license was found in a gold Dodge Stratus a year later.

In sum, one of the victims positively identified Villarreal as being one of the robbers at Sally's Beauty Supply; another victim identified Villarreal as one of the robbers at Bed Bath & Beyond. Villarreal's driver's license was found in a gold Dodge Stratus, matching the description of the vehicle used by the robbers at the Ultimo Taco robbery. There was physical evidence—Medders's hat and torn pantyhose—connecting Villarreal, who was in and out of Medders's apartment during the relevant time period, to the scene of the robbery at Bed Bath & Beyond. Finally, Villarreal's talking with Gonzalez about "Sally's" and "not going to the same place twice," giving Medders money for rent that same evening, and telling Medders he needed to leave town after Gonzalez was arrested, corroborates Gonzalez's testimony. *See Brown*, 270 S.W.3d at 568 (citing *Killough v. State*, 718 S.W.2d 708, 711 (Tex. Crim. App. 1986) (en banc) (holding that sufficient accomplice-witness corroboration may be furnished by the suspicious conduct of a defendant)). Thus, considering the non-accomplice evidence together as a whole while viewing the evidence in the light most favorable to the jury's verdict, we conclude that a rational fact-finder could have concluded that the non-accomplice evidence tended to connect Villarreal to the offenses. *See Simmons*, 282 S.W.3d at 508, 511; *Brown*, 270 S.W.3d at 567. We overrule Villarreal's fifth issue.

15

### III. CONCLUSION

Having overruled all issues, we affirm the judgment of the trial court.

NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
4th day of March, 2010.